UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SPECTRUM LABORATORIES, LLC,
              Plaintiff,

v.

URZ TRENDZ, LLC,
                 Defendant.

**Case No. 4:22-CV-03705**

**Hon. Judge Charles Eskridge**


**JURY TRIAL DEMANDED**


## <u>DECLARATION OF LOUIS F. TERAN</u>

I, Louis F. Teran, declare as follows:

1. I submit this declaration in support of Defendant URZ Trendz, LLC.'s ("Defendant") Motion for Reconsideration and Objection Regarding the Court's Order for Forensic Discovery. I am counsel of record for Defendant. I have personal knowledge of the matters set forth below, and if called as a witness, I would and could competently testify thereto.

2. Attached hereto as **Exhibits A** is a true and correct copy of an Affidavit issued by Royal Fragrances, LLC to Plaintiff Spectrum Laboratories, LLC ("Plaintiff").

3. Attached hereto as **Exhibit B** is a true and correct copy of relevant sections of Plaintiff's responses to Defendant Interrogatories.

4. Attached hereto as **Exhibit C** is a true and correct copy of the transcript for the Initial Conference held by this Court on May 3, 2023.

5. Attached hereto as **Exhibit D** is a true and correct copy of the transcript for the Motion Discovery Hearing held by this Court on February 13, 2024.

6.      In anticipation of filing this Motion on behalf of Defendant, I held a telephonic conference with Plaintiff's counsel, Mr. David B. Cupar, pursuant local rules on February 27, 2024.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 28th day of February, 2024, at Pasadena, California.


_____
Louis F. Teran

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Spectrum Laboratories, LLC | ) | Case No. 4:22-cv-03705 |
| | ) | |
| Plaintiff, | ) | Judge Charles Eskridge |
| | ) | |
| vs. | ) | |
| | ) | |
| Royal Fragrances LLC, dba City Supply | ) | |
| Wholesale et al., | ) | |
| | ) | |
| Defendants. | ) | |

### Declaration of Saif Ali

I, Saif Ali, declare as follows:

1.      I own and operate Royal Fragrances LLC, which does business as "City Supply Wholesale." I will refer to Royal Fragrances as "RF" in this declaration. RF is a named defendant in the above-captioned case (the "Action").

2.      I also own and operate the following companies that are named defendants in the Action: SA & AP Investments LLC and Legacy Ecom LLC (collectively, the "Other Ali Businesses"). The Other Ali businesses are both retail jewelry businesses that do not sell *Quick Fix* or any similar products.

3.      I understand that Spectrum Laboratories LLC filed a Complaint in the Action in which Spectrum alleges that RF and the other defendants sold counterfeit versions of Spectrum's *Quick Fix* synthetic urine product.

4.      Prior to receiving notice of this lawsuit by Spectrum, neither myself nor any of my businesses had any knowledge or reason to believe that the *Quick Fix* products sold

by RF were counterfeits. Both I and RF believed that the *Quick Fix* that RF purchased and sold were genuine *Quick Fix*.

5.    None of the Other Ali Businesses sell or market *Quick Fix*, and none of the Other Ali Businesses had any involvement whatsoever with the purchase and sale of *Quick Fix* at issue in this case.

6.    The only business that I own or operate that has ever bought or sold *Quick Fix* is RF.

7.    As to the other defendants in the case: (a) I do not know the individual Mohd Lodi, I have never heard of him before, and he has no connection to me or my businesses; (b) I do not know the businesses Trek the World LLC, Precision Technology Consulting, or Nagaria Usman Ghani LLC, I have never heard of those businesses before, and they have no connection to me or my businesses; and (c) Afee Parpia is a partner in SA & AP LLC and Legacy Ecom LLC, and he has no connection to RF.

8.    Attached as Exhibit A are true and accurate copies of invoices documenting RF's lifetime purchases of *Quick Fix* product. Those invoices account for all of RF's purchases of *Quick Fix*.

9.    As the invoices attached as Exhibit A show, the only business from which RF has purchased *Quick Fix* are: Supreme Imports LLC, Elite Wholesale, and MWI Wholesale. There are no other businesses or individuals from whom RF has purchased or received *Quick Fix*.

SA.

ROYAL0009L-000223

10.     Attached as Exhibit B are true and accurate copies of invoices documenting RF's sales and returns of *Quick Fix* products. Those invoices, minus returns shown, account for all of RF's lifetime sales of *Quick Fix*.

11.     RF has a current inventory of *Quick Fix* of 112 unit, which RF has quarantined and will provide to Spectrum.

12.     The names and contact information for the companies that supplied *Quick Fix* to RF that I provided to Spectrum are complete and accurate.

I declare under penalty of perjury that the foregoing is true and accurate.


Executed on December 16, 2022.          _____
                                                          Saif Ali

S.A.

ROYAL0009-000224

**EXHIBIT B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **SPECTRUM LABORATORIES,** | § | |
| **LLC**., an Ohio Limited Liability | § | |
| Company. | § | |
| | § | **CIVIL ACTION NO. 4:22-cv-03705** |
| *Plaintiff,* | § | |
| | § | **JUDGE CHARLES ESKRIDGE** |
| **v.** | § | |
| | § | **JURY DEMAND** |
| **URZ Trendz, LLC a/k/a Fly Fresh** | § | |
| **Smoke; and DOES #1-10,** | § | |
| | § | |
| *Defendants.* | § | |

## SPECTRUM'S OBJECTIONS AND RESPONSES TO
## URZ'S FIRST SET OF INTERROGATORIES

In accordance with FED. R. CIV. P. 26 and 33, Plaintiff Spectrum Laboratories, LLC

serves its objections and responses to the First Set of Interrogatories issued by Defendant

URZ Trendz, LLC a/k/a Fly Fresh Smoke ("Defendant" or "URZ").

DATE: November 1, 2023          Respectfully submitted,

By:  _/s/ David B. Cupar_____
David B. Cupar (*pro hac vice pending*)
*Attorney in Charge*
Ohio Bar No. 71622
dcupar@mcdonaldhopkins.com
Matthew J. Cavanagh (*pro hac vice pending*)
Ohio Bar No. 79522
mcavanagh@mcdonaldhopkins.com
**MCDONALD HOPKINS LLC**
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Facsimile: 216.348.5474

By:  _/s/ Courtney Ervin_____
**Courtney Ervin**
Texas Bar No. 24050571
SDTX No. 611093
cervin@hicks-thomas.com
**Kasi Chadwick**
Texas Bar No. 24087278
SDTX No. 2421911
kchadwick@hicks-thomas.com
**HICKS THOMAS LLP**
700 Louisiana St., Suite 2000
Houston, Texas 77002
Telephone: 713.547.9100
Facsimile: 713.547.9150

**ATTORNEYS FOR PLAINTIFF SPECTRUM
LABORATORIES, LLC**

**CERTIFICATE OF SERVICE**

Service of this document on all counsel was accomplished via e-amil on November
1, 2023.

_/s/ David B. Cupar_____
David B. Cupar

32800919.2

**SPECTRUM'S OBJECTIONS AND RESPONSES TO
URZ'S FIRST SET OF INTERROGATORIES**

**Objections to "Definitions"**

Spectrum objects to URZ's "Definitions" to the extent they attempt to impose obligations that are greater than or different from those imposed by the Federal Rules of Civil Procedure, the Local Rules, and the Court's Orders governing discovery. Spectrum will respond to discovery requests in accordance with applicable and governing laws, rules, and Court orders.

**Specific Responses**

**INTERROGATORY NO. 1**: Identify any and all wholesalers to whom YOU have sold any of the PRODUCTS within the last seven (7) years.

**Response:** Spectrum objects to this interrogatory as neither relevant to any party's claim or defense nor proportional to the needs of the case, considering the importance of the issues at stake in the action, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery which outweighs its likely benefit. This action concerns Spectrum's allegation that URZ has infringed and counterfeited its trademarks. The names of Spectrum's wholesalers is not relevant because that information would not tend to make a fact in consequence in determining this action more or less probable than it would be without that information. Spectrum further objects that this interrogatory is intended to harass and needlessly increase the cost of litigation. Accordingly, Spectrum is standing on the foregoing objections.

**INTERROGATORY NO. 2**: Identify any and all PERSONS that have distributed any of the PRODUCTS within the last seven (7) years.

**Response:** Spectrum objects to this interrogatory as neither relevant to any party's claim or defense nor proportional to the needs of the case, considering the importance of the issues at stake in the action, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery which outweighs its likely benefit. This action concerns Spectrum's allegation that URZ has infringed and counterfeited its trademarks. Spectrum further objects that this interrogatory is intended to harass and needlessly increase the cost of litigation. The names of Spectrum's distributors is not relevant because that information would not tend to make a fact in consequence in determining this action more or less probable than it would be without that information. Accordingly, Spectrum is standing on the foregoing objections.

3

**INTERROGATORY NO. 3**: Explain with specificity the intended use of each and every one of the PRODUCTS.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 4**: Explain with specificity the likely use of each and every one of the PRODUCTS by consumers.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 5**: Identify YOUR total sales of each and every one of the PRODUCTS annually for the last seven (7) years.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 6**: Identify YOUR total sales annually for the last seven (7) years.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 7**: Identify YOUR total profits of each and every one of the PRODUCTS annually for the last seven (7) years.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain Spectrum's company-wide profits with substantially the same burden as for Spectrum. Spectrum does not track profits on a per-product basis.

**INTERROGATORY NO. 8**: Identify YOUR total profits annually for the last seven (7) years.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 9**: Explain with specificity the manner in which each and every one of the PRODUCTS are displayed for sale.

**Response:** Spectrum displays its products for sale on its website at <urineluck.com>. Spectrum expects that retailers display the product on store shelves, in display cases, and behind the counter.

**INTERROGATORY NO. 10**: Identify with specificity each and every one of the PRODUCTS. In YOUR response, include name of each PRODUCT, description of each PRODUCT, and YOUR item number for each PRODUCT.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 11**: State with specificity when and how YOU first started using each of the TRADEMARKS.

**Response:** Spectrum first started using the marks by placing them on products, product packaging, and on its website. Spectrum began using the QUICK FIX mark by at least Dec. 31, 1999, and it began using the Q-Clock mark by at least April 30, 2017.

**INTERROGATORY NO. 12**: Identify all channels through which YOU have advertised each and every one of the PRODUCTS (i.e. all accounts with Amazon.com, google.com, ebay.com, or advertising channels).

**Response:** Spectrum advertises its products on its website, word of mouth, trade shows, and Google Ads.

**INTERROGATORY NO. 13**: Explain with specificity why YOU decided to use the word "QUICK FIX" as a trademark in connection with the PRODUCTS.

**Response:** Spectrum does not recall why the phrase "QUICK FIX" was chosen as a trademark for the products.

**INTERROGATORY NO. 14**: Explain with specificity why YOU decided to use the Q design mark as a trademark in connection with the PRODUCTS.

**Response:** Spectrum does not recall why the Q design mark was chosen as a trademark for the products.

**INTERROGATORY NO. 15**: Describe in detail the selection and development of each of the TRADEMARKS, including but not limited to, YOUR reason(s) for selecting each

of the TRADEMARKS and any research or searches YOU performed prior to selecting each of the TRADEMARKS.

**Response:** Spectrum does not recall how or why the QUICK FIX and Q-Clock marks were selected.

**INTERROGATORY NO. 16**: List the amount of money YOU spent annually in advertising each of the TRADEMARKS within the last five (5) years.

**Response:** In accordance with FED. CIV. R. 33(d), Spectrum is producing business records from which URZ may obtain the answer to this interrogatory with substantially the same burden as for Spectrum.

**INTERROGATORY NO. 17**: Identify all third parties to whom YOU issued or sent a cease and desist letter RELATED TO any of the TRADEMARKS.

**Response:**
513 Ventures, LLC.
Xhale Distributors
Sahil Chopra, dba Golden Fix Urine

**INTERROGATORY NO. 18**: Identify all third parties to whom YOU issued or sent a cease and desist letter RELATED TO any of the PRODUCTS.

**Response:** Spectrum objects to this request as irrelevant and disproportionate to the needs of the case. Spectrum's enforcement of non-trademark rights, such as patent rights, against third-parties is not relevant because that information would not tend to make a fact in consequence in determining this trademark action more or less probable than it would be without that information. Moreover, the request is not limited in time. The request is disproportionate to the needs of the case because Spectrum has enforced its patent rights many times in the past twenty years, and it would take significant time, effort, and resources to look through its and its legal counsel's files to find all cease-and-desist letters "related to any of the products." Accordingly, Spectrum is standing on the foregoing objections.

**INTERROGATORY NO. 19**: Identify any and all third parties that provided YOU with any information RELATED TO the infringement/counterfeiting or potential infringement/counterfeiting of any of the TRADEMARKS by PROPOUNDING PARTY.

**Response:** URZ and its attorney. As stated in Spectrum's Complaint, URZ and its attorney's evasive response to Spectrum's Subpoena (including denying sale of *Quick Fix*), and URZ's ongoing refusal to produce complete sales information for *Quick Fix* sales and purchases provides Spectrum with more than enough information to believe that URZ is an active and willful participant in the counterfeiting of *Quick Fix*. Additionally, URZ's

defense in this action that it is legally allowed to counterfeit *Quick Fix* because it is allegedly an "unlawful" product further evidences that URZ is counterfeiting or selling counterfeit *Quick Fix*.

**INTERROGATORY NO. 20**: For each third party identified in response to Interrogatory No. 19, explain in detail what information was given to YOU.

**Response:** *See* response to Interrogatory No. 19.

**INTERROGATORY NO. 21**: Explain in detail what information RELATED TO the claims and defenses asserted in this action was provided to YOU by Royal Fragrances, LLC d/b/a City Supply Wholesale.

**Response:** Royal Fragrances provided a sworn affidavit, attesting that it had no knowledge of the counterfeiting, and it provided business records documenting its purchase and sale of *Quick Fix*.

**INTERROGATORY NO. 22**: Explain in detail what investigation of PROPOUNDING PARTY YOU conducted before YOU filed claims in this action against PROPOUNDING PARTY.

**Response:** Spectrum objects to this interrogatory on work-product and attorney-client privilege insofar as URZ seeks investigative work done by or in conjunction with legal counsel. Spectrum is withholding information on the basis of this objection. Otherwise, investigative work by Spectrum is detailed in its Third Amended Complaint, and Spectrum incorporates that pleading here by reference.

**INTERROGATORY NO. 23**: Explain in detail, any and all evidence that YOU had as of August 30, 2023, RELATED TO PROPOUNDING PARTY's infringement/counterfeiting of any of the TRADEMARKS.

**Response:** Spectrum objects to this interrogatory on work-product and attorney-client privilege insofar as URZ seeks investigative work done by or in conjunction with legal counsel. Spectrum is withholding information on the basis of this objection. Otherwise, *see* response to Interrogatory No. 19 and Spectrum's Third Amended Complaint.

32800919.2

**EXHIBIT C**

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3                HOUSTON DIVISION

4   SPECTRUM LABORATORIES, LLC    §    CASE NO. 4:22-CV-03705
                                  §    HOUSTON, TEXAS
5   VERSUS                        §    TUESDAY,
                                  §    MAY 3, 2023
6   ROYAL FRAGRANCES, LLC, ET AL  §    2:33 P.M. TO 2:42 P.M.

7              **INITIAL CONFERENCE (VIA ZOOM)**

8        BEFORE THE HONORABLE CHARLES ESKRIDGE
                UNITED STATES DISTRICT JUDGE

9

10

11
    APPEARANCES:                        SEE NEXT PAGE
12
    ELECTRONIC RECORDING OFFICER:    MAYRA M. MARQUEZ
13
    CASE MANAGER:                    JENNELLE GONZALEZ
14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX 77478
                     281-277-5325
23          mary@judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1        **<u>APPEARANCES (VIA ZOOM)</u>:**

2

3    FOR THE PLAINTIFF:          MCDONALD HOPKINS, LLC
                                 David B. Cupar, Esq.
4                                600 Superior Avenue East
                                 Suite 2100
5                                Cleveland, OH  44114
                                 216-348-5400
6
                                 HICKS THOMAS, LLP
7                                Courtney E. Ervin, Esq.
                                 Kasi Chadwick, Esq.
8                                700 Louisiana Street
                                 Suite 2300
9                                Houston, TX  77002
                                 713-547-9100
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **HOUSTON, TEXAS; TUESDAY, MAY 3, 2023; 2:33 P.M.**

2           THE COURT:  All right.  Judge Eskridge joining by

3   zoom.  Am I visible and audible?

4           MS. CHADWICK:  Yes, Your Honor.

5           THE COURT:  Okay.  All right, I call -- I have an

6   Initial Conference here that I'll do by zoom, and then I'll

7   be into the courtroom for a hearing in person.

8           I first called 22-3705, Spectrum Labs, LLC versus

9   a number of Defendants, but who I think have been replaced

10  at this point as Defendant Does 1 through 10.

11          I'm not sure what counsel we have here.  Can I

12  get appearances and for which parties?

13          MR. CUPAR:  I represent Plaintiff Spectrum Labs.

14  My co-counsel here are Kasi Chadwick and Courtney Ervin.  So

15  all three lawyers here before you are for Plaintiff.

16          THE COURT:  Okay, so I have read the joint

17  discovery and case management plan, and I think I understand

18  the background of what's going on.  Where are you in the

19  process of trying to identify who your Does are and what do

20  you need from an initial conference right now?

21          MR. CUPAR:  Thank you, Your Honor.

22          So we're down to two subpoenas, two non-parties

23  we're seeking information from.  We think they've got the

24  information to identify the originator of the counterfeiting

25  good here.  That's the key obviously to this case.  And

1 converting the Doe into a Defendant, so to speak, a named

2 Defendant.

3 So the two parties that we're seeking information

4 from are called -- I'll use single names Exotic, as well as

5 URZ. URZ, the lawyer there we've been in touch with,

6 initially got no response. We reached out to counsel from a

7 meet-and-confer standpoint. Initially, the counsel

8 completely refused to provide us any information in our

9 meet-and-confer. Counsel agreed that they would provide

10 information, URZ, if there was a protective order in place

11 to protect information with respect to his client, we agreed

12 to that protective order. The Court entered that protective

13 order.

14 That party, URZ, still did not respond to that

15 subpoena with any documents or information.

16 We filed this week, Your Honor, before this

17 Court, a motion to compel discovery on that issue. We've

18 exhausted every avenue. We tried not to get the Court

19 involved with that, but that's where we're at there and

20 their motion will identified that at a high level.

21 So we're expecting now with URZ's counsel to

22 respond to that motion and -- and/or hopefully just provide

23 discovery so we can withdraw that motion and move forward

24 with that. But that's where that one's at.

25 A second subpoena, another party, it's in

1  Arizona.

2        THE COURT:  Well, let me let me pause you there

3  for just a second.

4        So I have -- and I guess it was just filed today

5  -- a motion to compel discovery against URZ Trends, so that

6  I just want to make sure what I was understanding, it was

7  freezing up a little bit.  Is that motion pending and live

8  before me?  Do you need a ruling on it or is it is it off

9  the table now?

10        MR. CUPAR:  It's pending and lies before you.  We

11  are -- we sent it over or are sending it over to opposing

12  counsel -- obviously they're not on the Court's PACER system

13  -- with the idea there of hopefully that will get that

14  opposing counsel and his client to the finish line in

15  regards to providing us responsive information for the

16  subpoena.

17        MS. ERVIN:  I do unfortunately anticipate we're

18  probably going to need a ruling from you on the motion, but

19  I do think that URZ's counsel should get an opportunity to

20  respond, and it's being served on them today, so they

21  definitely haven't had a chance to do that yet.

22        THE COURT:  Hum...

23        MS. ERVIN:  Well I'll leave that up to you then.

24        THE COURT:  Yeah.  I mean, they're not a party

25  here.  They're not being forthcoming with information to

1  you.  So I don't know why I want to get tangled up with

2  that, because they're just going to have to give me the

3  information for me to decide whether they should be party.

4  And that's all you're trying to decide in the first place.

5          Am I misunderstanding something about that?

6          MS. ERVIN:  I don't think so, except that we

7  don't believe they're the counterfeiter.  We believe they're

8  purchasing from the counterfeiter, and they're trying to

9  protect the counterfeiter.  And so once we get the

10  counterfeiter, then we could replace a Doe with the

11  counterfeiter.

12          MR. CUPAR:  Well, I'll -- yeah, I'll keep that

13  open.  Let's just say we we know they know who it is.  We'll

14  leave it at that, Your Honor.

15          THE COURT:  Let me say this.  I'm going to enter

16  -- I'm granting the motion.  I'm going to enter -- my clerks

17  are making a note here.  I'm going to enter the order

18  granting a motion to compel that you provided before me.

19          But I'm going to indicate that they can seek to

20  -- seek protection on the discovery that you're seeking.

21  Right?  But you're allowed to serve this motion and they're

22  ordered now to do all of this.  In responding, they can seek

23  whatever protection they want, but I just don't see why

24  there's a threshold litigation about whether you ask them

25  the questions or not in the first place.

1          I will also say to you that my impression is that

2   if they are not cooperative, if they are hiding things, but

3   if you have reasonable basis to bring them into the action,

4   you can let them know that I'm going to let you plead that

5   on information and belief, and they are going to be a party

6   here.

7          So as long as -- and you know what information,

8   you can't just, you know, ad hoc say you've got information

9   and belief.  If you've got reasons why you think they're

10  involved, but it doesn't connect it all the way, I'll let

11  you plead it on information and belief and we'll sort it out

12  at that point.

13          MR. CUPAR:  Thank you, Your Honor.

14          THE COURT:  Okay.  All right.  Now, as to the

15  other, so you pleaded for those 1 through 10, but you think

16  there's really only Does 1 and 2 at this point?

17          MR. CUPAR:  That's right.

18          THE COURT:  Okay.  So tell me about the other.

19          MR. CUPAR:  Yeah.  So a similar situation, a

20  supplier, so through the information we've received through

21  the other subpoenas so far, one of them purchased from this

22  company Exotic in Arizona, the product.

23          So again, we believe that this company in Arizona

24  Exotic either they -- again, same thing.  I'll leave it at a

25  high-level general statement.  They know who the source is,

1  so to speak.

2  THE COURT: Okay. And where are you in trying to

3  get information or moving to compel information from them?

4  MR. CUPAR: Yeah. So what we tried there is our

5  client actually knows somebody at the company there.

6  They've just been non-responsive, no lawyer. So we've been

7  a little bit careful just from a legal rights standpoint,

8  making sure they're represented or how we approach them,

9  won't be an issue there. So we're trying our best to reach

10 out to them and have them comply to the subpoena, again,

11 without motion practice there in Arizona.

12 THE COURT: All right. And you'll have a -- my

13 practice is to -- you'll have a minute entry from this which

14 will specify the rulings that I'm making here. Between that

15 and the ruling on your other motion to compel, that should

16 probably get their attention and get some cooperation.

17 MR. CUPAR: Thank you, Your Honor.

18 THE COURT: All right. As you're talking with

19 them about things, obviously -- I guess I'll call this now

20 our pre-initial conference. I'll have an initial conference

21 once you've actually got Defendants identified, so that they

22 can also be here and start telling me what they want to say.

23 MR. CUPAR: That makes sense, Your Honor.

24 THE COURT: Okay. All right, so it sounds like

25 there's a little bit of discovery that you all need.

1          Is there anything else that really can be done at
2     this point, since we don't have Defendants present?
3                MR. CUPAR:  Nothing further, Your Honor.
4                THE COURT:  All right.  Well, I will probably see
5     you in 60 or 90 days.
6                MR. CUPAR:  Look forward to seeing you in
7     Houston, Your Honor.  And it's cold and -- well, yeah.  Take
8     care.
9                THE COURT:  Thank you very much.
10               MR. CUPAR:  Thank you, Your Honor.
11               THE COURT:  I'll be in to the court -- I'll be in
12     to the courtroom directly.  Thank you.
13               MR. CUPAR:  Bye bye.
14         (Proceedings adjourned at 2:42 p.m.)
15                              *  *  *  *  *
16         *I certify that the foregoing is a correct*
17     *transcript to the best of my ability produced from the*
18     *electronic sound recording of the proceedings in the above-*
19     *entitled matter.*
20     */S/  MARY  D.  HENRY*
21     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
22     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
23     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
24     *JTT TRANSCRIPT #68240*
25     *DATE FILED:  FEBRUARY 19, 2024*

# EXHIBIT D

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE SOUTHERN DISTRICT OF TEXAS |
| 3 | HOUSTON DIVISION |

```
 4  SPECTRUM LABORATORIES, LLC    §    CASE NO. 4:22-CV-03705
                                  §    HOUSTON, TEXAS
 5  VERSUS                        §    TUESDAY,
                                  §    FEBRUARY 13, 2024
 6  ROYAL FRAGRANCES, LLC, ET AL  §    2:39 P.M. TO 3:43 P.M.
```

7                **MOTION DISCOVERY HEARING (VIA ZOOM)**

8        BEFORE THE HONORABLE CHARLES ESKRIDGE
           UNITED STATES DISTRICT JUDGE

9

10

11

```
12  APPEARANCES:                       SEE NEXT PAGE

13  ELECTRONIC RECORDING OFFICER:      KIMBERLY PICOTA

14  CASE MANAGER:                      JENNELLE GONZALEZ
```

15

16

17

18

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
           935 Eldridge Road, #144
22             Sugar Land, TX 77478
             281-277-5325
23         mary@judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.

1                          **<u>APPEARANCES</u>:**

2

3    FOR THE PLAINTIFF:                MCDONALD HOPKINS, LLC
                                       David B. Cupar, Esq.
4                                      600 Superior Avenue East
                                       Suite 2100
5                                      Cleveland, OH  44114
                                       216-348-5400
6

7                                      HICKS THOMAS, LLP
                                       Ryan Cordell, Esq.
8                                      700 Louisiana Street
                                       Suite 2300
9                                      Houston, TX  77002
                                       713-547-9100
10

11   FOR THE DEFENDANT:               SLC LAW GROUP
                                       Louis F. Teran, Esq.
12                                     1055 East Colorado Ave.
                                       Suite 500
13                                     Pasadena, CA  91106
                                       818-484-3217
14

15

16

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS; TUESDAY, FEBRUARY 13, 2024; 2:39 P.M.**

2              COURT SECURITY OFFICER:  All rise.  United States

3      District Court for the Southern District of Texas is now in

4      session.  The Honorable Charles Eskridge presiding.

5              God save these United States and this Honorable

6      Court.

7              THE COURT:  Thank you, everyone.  Please be

8      seated.

9              I call for the Discovery in Motion Hearing

10     22-3705, Spectrum Laboratories, LLC versus -- is terminated

11     URZ Trends, LLC.  And, okay, then there's counter.

12             Can I get appearance of counsel, please?

13             MR. CUPAR:  Your Honor, my name is David Cupar on

14     behalf of Spectrum Labs, my co-counsel is Ryan Cordell.

15             THE COURT:  Thank you very much.

16             MR. TERAN:  Good afternoon, Your Honor.  My name

17     is Louis Teran.  I represent the Defendant, URZ Trends LLC.

18             THE COURT:  All right.  Thank you, sir.

19             And Royal Fragrances, LLC, I just want to make

20     sure I'm showing them as terminated along with -- there were

21     a lot of other Defendants in this action by name that have

22     been terminated.  Is that all correct?  The only Plaintiff

23     and Defendant is who we have in the room now?

24             MR. CUPAR:  Yes, sir.

25             THE COURT:  All right. Thank you very much.

1          Okay, so discovery dispute that has risen up to

2   the point of a motion for sanctions.  And I also have before

3   me a motion to strike a response that was part of the motion

4   for sanctions.  Is that what I have?

5          Anything else on the Agenda that in y'all's mind?

6          MR. TERAN:  Yeah.  Your Honor, we also have a

7   discovery letter that we --

8          THE COURT:  And then your discovery letter.

9          MR. TERAN:  Correct.

10         THE COURT:  Okay.  I also have that, yes, and I

11  read that.

12         Is there any other further update as to the state

13  of discovery or what has been turned over?  Have you all

14  discussed further in preparing for this hearing, anything

15  further to advise me on current status of discovery efforts?

16         MR. CUPAR:  No, Your Honor.

17         MR. TERAN:  No no, no, Your Honor.

18         THE COURT:  All right.  Let's start with the

19  motion to strike, just to get it set up.  And I'm -- I don't

20  need argument on this one.  I'm going to deny the motion.

21  From the Plaintiff's perspective, if you're asking for

22  sanctions, it's better for me to have heard whatever the

23  Defendant wants to respond makes the Record cleaner.

24         I will say -- sorry, I should get my docket sheet

25  here.

1          Mr. Teran, I'm not getting exercised about it,

2    but I did not appreciate the ellipses that you used as to my

3    prior order to elide the fact that really, the ten-day

4    requirement was as to the motion that was being brought.

5          I note that in the practice that followed, the

6    ten days fell within the Christmas Holiday.  Like I think

7    your date was December 26th.  And if you'd asked for an

8    extension on that basis, I would have given it.

9          But you did not do yourself much service by

10    chopping up my Order to try to convey that it said something

11    that it didn't.  Okay?

12          Do you want to respond in any way to that?

13          MR. TERAN:  Yes.

14          THE COURT:  That's my impression of what you did.

15          MR. TERAN:  Yeah.  Yes, Your Honor.  I truly

16    understood your Order to indicate that there was an OSC,

17    with regards to the -- which is why I submitted.

18          THE COURT:  And I -- I got that, and I did not --

19    I talked with my -- I noted that that was there, and so what

20    I hear and what I understand is that you may have been

21    confused about that, I agree.  But you still ellipsed my

22    Order and took out a very critical paragraph in trying to

23    explain what was going on.

24          MR. TERAN:  Well, I apologize for that, Your

25    Honor.  I, I truly and I truly, and I read the order again

1  last night --

2          THE COURT:  Okay.

3          MR. TERAN:  -- in preparation for this.  And as I

4  read it and I, you know, no disrespect to the Court.

5          THE COURT:  Yep.

6          MR. TERAN:  As I read it, it seems like an OSC

7  Order with an expectation that a motion may be coming in the

8  future.  I truly believe that those deadlines were related

9  to the OSC.

10          THE COURT:  Okay.  And in any event, based on

11  what you're saying, your understanding was, I see that you

12  complied with your understanding of that deadline, which was

13  within 21 days, ten days fell on -- so I'm not -- just on

14  briefing in the future, I read and look at those types of

15  things, just so you know.  Okay?

16          All right.  Let me make sure there was nothing

17  else on this that I wanted to raise.

18          All right, so I do have that paper before me and

19  it has been read and considered.

20          Let me take up next Defendant's discovery letter

21  that is pending.  I have read Spectrum's response letter of

22  December 14th, which attached an email from December 1st

23  saying basically, hey, here's what we're producing and

24  responding right now and closing with.  I'm happy to discuss

25  further by phone.

1          And that there was no attempt to really vet this

2    as a dispute or bring it to a head before firing off a

3    discovery letter.  My rules do require a full conference and

4    try to get on the same page, too, as if there are specific

5    -- there may well be specific things that you're saying in

6    your letter that you are entitled to.  But there needs to be

7    cooperation and conversation between counsel before it's

8    appropriate to bring it to my attention.

9          So the relief on the discovery -- the relief

10   requested in the discovery letter of December 11th is denied

11   without prejudice to conversation, further conversation

12   between counsel, and if it can't be worked out, then you can

13   submit another letter.  Okay?

14          MR. TERAN:  Fair enough, Your Honor.  Thank you.

15          THE COURT:  All right.  I will also say for the

16   Record on that from the response that Spectrum's counsel

17   gave, that the quickness with which you chose to bring a

18   discovery dispute, does have the appearance of trying to

19   manufacture a discovery dispute.  You may disagree with

20   that.  That's fine.

21          But I'll tell you when I'm looking at a next

22   discovery letter from you, I'm going to have in mind whether

23   I think cooperation is being attempted by counsel.  Okay?

24          And anything further you'd like to say on that,

25   Mr. Teran?

1            MR. TERAN:  Yes. Your Honor.  I -- when I read

2  the letter, the response letter, there were certain issues

3  that I thought were not going to be resolved, but there were

4  certain issues that I thought would be resolved.  And so in

5  my dispute letter to the Court, I only raised the issues

6  that I thought would not be resolved.  And I did it

7  expeditiously, only because we have a short period of time

8  for discovery.

9            THE COURT:  Yeah.

10           MR. TERAN:  And and we do want to take

11 depositions.

12           THE COURT:  Okay.  All right.  So the letter is

13 denied without prejudice.  Counsel to confer.  And then I'll

14 take up anything further on that, if needed.

15           All right, so then that leaves the motion for

16 sanctions that's pending at Docket 83.

17           Mr. Cupar, are you taking the lead on argument

18 here?

19           MR. CUPAR:  Yes, sir.

20           THE COURT:  So you've received 63 pages total?

21           MR. CUPAR:  46 plus 6, makes it less than that,

22 52.

23           THE COURT:  52 pages total.  All right.

24           Mr. -- is it Tehran?

25           MR. TERAN:  It's Teran.

1              THE COURT:  Teran.  Did you simply ask your

2    client to do a search, or did you conduct the search

3    yourself, or have people from your office conduct the

4    search?

5              MR. TERAN:  Your Honor, I asked my client to

6    conduct a search.

7              THE COURT:  Okay.

8              MR. TERAN:  And I was -- I was assured that this

9    is all the documents that are -- that are there.  And I

10   should point out, this is a -- a small business that sells a

11   wide variety of products.  And this apparently is one

12   product that they sold as an offshoot -- very, very small

13   amounts of it.

14             And we have reason to believe that our supplier

15   is an authorized distributor of these products.  So we don't

16   we don't believe that any of these products that we sold are

17   actually --

18             THE COURT:  So you have a supplier of these

19   products?  Has that been turned over, Mr. Cupar, all

20   documents as to who the supplier might be?

21             MR. CUPAR:  No.

22             THE COURT:  Okay, so that's one problem.

23             MR. TERAN:  Well, no, we turned over the invoices

24   that we received from our supplier.

25             THE COURT:  Okay.

1          MR. TERAN: That is -- that is incorrect.

2          THE COURT: But there's no other communications?

3          MR. TERAN: No.

4          THE COURT: There's no -- there's invoices, but

5 there's no communications with the supplier?

6          MR. TERAN: Correct.

7          THE COURT: Okay.

8          MR. TERAN: So we have -- we turned over invoices

9 and then through the letter they requested actual proof that

10 we paid. So we turned over our checks indicating that we

11 paid to that source. But beyond that, no, there's been no

12 communication.

13          THE COURT: And that's just -- say so of your

14 client to you, correct?

15          MR. TERAN: That -- that is correct.

16          THE COURT: Okay. I will say, Mr. Taren, that

17 there is going to be further discovery that's ordered here.

18 As I said in my prior order, that the motion could request

19 intrusive electronic discovery. And so some real Court

20 Ordered discovery is going to go on. And so I want --

21 what's already been represented to me is what the Record is.

22 I want you to know quite clearly that I take discovery very

23 seriously and representations as to discovery very

24 seriously.

25          So I'm simply saying be careful on what you are

1  absolutely representing to me, because if -- when the

2  discovery happens, it's contrary to assertions that have

3  been made -- I either, if that's what -- either you or your

4  client will be held to account for that, okay?

5         So I'm giving you a chance just to know I'm going

6  to be looking at this.

7         MR. TERAN:  Yeah, understood, Your Honor.

8         THE COURT:  Okay.

9         MR. TERAN:  Crystal clear.

10        THE COURT:  If your client is misleading you,

11  that's fine.  That happens to lawyers.  I'm just letting you

12  know, let's be careful, okay?

13        MR. TERAN:  Yes, Your Honor.

14        THE COURT:  Okay.

15        MR. TERAN:  Can I add one more thing?

16        THE COURT:  Yes.

17        MR. TERAN:  I know for a fact that we turned over

18  invoices from our suppliers.

19        THE COURT:  Okay, and I think some of those have

20  been -- and I don't know that there's a disagreement about

21  that.

22        MR. TERAN:  Oh, I thought you just indicated that

23  we didn't.

24        THE COURT:  The invoice -- Mr. Cupar, on the

25  invoices that were turned over, what were those?

1

2          MR. CUPAR:  I don't know what the invoices are.

3    There's an in here -- I have it here.

4          Thank you.  No, that's a -- that's a purchase, I

5    think.

6          May I proceed just up to the ELMO?

7          THE COURT:  Sure.

8          MR. CUPAR:  Just for a moment, Your Honor.

9          THE COURT:  Do you have something that you wanted

10   to present to me?

11         MR. CUPAR:  Oh, I can put it on the ELMO, Your

12   Honor, if that's okay?

13         THE COURT:  No, no, no. The screen's down and

14   ready, did you have a PowerPoint presentation that you

15   wanted to go through?

16         MR. CUPAR:  Not a PowerPoint.

17         THE COURT:  Or just in case you wanted to show me

18   stuff?

19         MR. CUPAR:  I was just going to show you the

20   invoice, if I --

21         THE COURT:  Okay.  Go ahead.  All right.

22         MR. CUPAR:  -- understand Mr. Teran here.

23         I'm not sure, so I received -- here we go so the

24   Court can see that -- I received, for example, this is one

25   of the first six pages back in early September after after

1  the Court's initial Order.  I don't know what it is.  I

2  could tell it's some sort of document that shows some sort

3  of SMK creation, it looks like at the top.

4              I'm sorry, just so you can hear me.

5              And then the name to URZ Trends.  I'm assuming

6  this might be the supplier document.  I just don't know.

7              THE COURT:  Okay.

8              MR. CUPAR:  What catches my eye, Your Honor --

9  again, connecting some dots here for a moment -- and I

10  apologize.  I don't want to get ahead of --

11              THE COURT:  No, that's all right.

12              MR. CUPAR:  -- where your questioning is, but

13  this is what kind of catches my eye.  We had a private

14  investigator in March when we initially provided the

15  subpoena under President Reagan's Trust But Verify theory,

16  and I followed that as a lawyer.

17              THE COURT:  Right I've -- yeah.

18              MR. CUPAR:  Yeah.  And so I just wanted to raise

19  this for a second, for a moment, just kind of giving some

20  context here, kind of what we're expecting versus what we

21  received, Your Honor, just for a moment.

22              And you can see, Your Honor, this receipt again,

23  it's not just the receipt.  There's some specifics on this

24  receipt that should catch the Court's eye.

25              So, for example, URZ Trends, the specific

address, there's a real specific receipt number on the top

right, Your Honor.  For example, date -- not just date, but

time of this transaction, obviously the name of the product,

it looks like the SKU is below that.  Taxes, customer

payment was by cash.

        But even things like employee name of a gentleman

or a lady here, the bluesman US man (phonetic), there's a

lot of specifics, right?  So when we are looking at --

        THE COURT:  But that's not part of the production

that was made to you?

        MR. CUPAR:  You got it.  You know where I'm

going.

        THE COURT:  Okay.

        MR. CUPAR:  That's right, Your Honor.

        THE COURT:  Okay.

        MR. CUPAR:  We still haven't seen it.  And

initially the representation, if you recall, there's no

responsive documents.  We don't sell the product.  That was

the initial representation.

        THE COURT:  I remember.

        MR. CUPAR:  Yeah.  So to your point about

representation, in my view on this, just again in my

practice too, and I think all of us as lawyers and as the

Court is what we want, is a "show don't tell" mentality

about discovery, not not just a representation, I did this

1  and what we haven't seen, and this is why we ended up filing

2  the motion for sanctions.  We don't take it lightly to seek

3  that relief -- is what we haven't seen here is the show part

4  of it.  You know, what steps have been taken, what

5  custodians, what keyword searches -- give you another one,

6  actually, about invoices, going back to Mr. Teran's point,

7  just the little thing -- again, just this just got produced

8  back in December of this type of -- it's mostly black for a

9  reason.

10           So this is another example of an invoice.  I

11  don't know if this is a supplier or customer.  Situation and

12  it's going to be Defendant No. 41, this document and you'll

13  see -- yeah, I'm sorry, Your Honor.

14           Thank you.  And this URZ Trends here, one is that

15  there's a whole redaction here.  So that's an issue in and

16  of itself that why produce something redacted if --

17           THE COURT:  But then line 15 is a Quick Fix

18  product.

19           MR. CUPAR:  You got it.  So I'm assuming this

20  must be a sale.  But take a look here.  For example, there's

21  a URZ Trends at gmail.com.  And what I didn't see in any of

22  the briefing from counsel here is for example, we looked at

23  that URZ Trends at gmail.com record and did a -- you know,

24  there's no specific.  Let me show you from the briefing.

25  This is what caught my eye.

1          So that's what I would expect.  Again,

2  expectation versus reality, I would have expected to have

3  seen these are the custodians, these are the email accounts.

4  We went in.  We did keyword searches.  This is what we found

5  or didn't find based on that.

6          And the Court and we at Spectrum found nothing

7  like that here.

8          I wanted to show this out of -- and this is out

9  of Document 84 on the Docket.  This is their opposition on

10 our motion for sanctions.  It's just a one paragraph

11 internal and external communication.  And all it is, is just

12 a representation that the Court ordered us to provide all

13 internal and external communications -- not us, but URZ and

14 that none of them exist.  But without an explanation, again,

15 the show parts, the part that's missing here and that's why

16 we sought the motion to begin with.  This only bolsters our

17 position as far as we're concerned.

18          THE COURT:  Yeah.  Anything else you want to show

19 me?

20          MR. CUPAR:  When we're ready, if it's

21 appropriate, I'll discuss the proposed order for the

22 sanctions that we presented.

23          THE COURT:  Right.  I'll get --

24          MR. CUPAR:  I'll hold off on that.

25

1      THE COURT:  -- yeah, I'll get around to that.

2      MR. CUPAR:  Yeah.  The redactions caught my eye

3  again.  Just it's -- I don't -- it doesn't matter what Court

4  we are in America -- State, Federal -- we -- parties can't

5  redact on the sole basis of relevance.  That's the old fox

6  guarding the chicken house problem.  So, again, that was

7  improper in and of itself.

8      So those are the key things.  I just wanted to

9  show everything else we identify in the briefing.

10  Obviously, if you have any questions, Your Honor, from what

11  we identified in our briefing, I'm happy to answer them, but

12  I'll otherwise sit back down.

13      THE COURT:  Okay.  All right.  Thank you.

14      MR. TERAN:  I would like to respond, Your Honor.

15      THE COURT:  Oh, yeah.  I guess go ahead first and

16  then I'll have questions for you.

17      MR. TERAN:  I want to correct one thing very

18  clear for the Record.

19      THE COURT:  Sure.

20      MR. TERAN:  We did produce the documents related

21  to the receipt that was that was shown to Your Honor.  I

22  would point counsel, the first thing that we produced was in

23  Bates Stamp Defendant 0005, is a spreadsheet that identifies

24  that transaction.  And then they came to us with a dispute

25  letter indicating we would like to see the invoices for all

1  of these transactions.  And we did produce that invoice.  It

2  is -- let me pull up the Bates Stamp here.  It is Bates

3  Stamp Defendant 0036.  It is the actual invoice for that

4  specific transaction.  It matches the date, the quantity,

5  the price, everything.

6          THE COURT:  Okay.  Mr. Cupar, do you have that?

7  Can you do --

8          MR. CUPAR:  I do and if I may again?

9          THE COURT:  Yeah.  Let's put that up.

10          MR. CUPAR:  Yeah, sure.  I'm just going to show

11  -- I'll show it first.

12          I don't agree with Mr. Teran's view.  So you said

13  five, right, sir?

14          MR. TERAN:  Yes, correct.

15          MR. CUPAR:  That's what I have on this, Doc Five.

16  So before I show this, I want to just show the receipt one

17  more time. Your Honor -- sorry to do this to you, but

18  just --

19          THE COURT:  No, I've got it in mind.  You don't

20  have to --

21          MR. CUPAR:  Yeah, yeah.  Okay.  So you saw the

22  details in the receipt.

23          THE COURT:  Yeah.

24          MR. CUPAR:  So the one question that pops up in

25  my head is, is what we're looking at here, this Document

1  Five from Defendant show any of that information that's

2  shown in that receipt and the answer is no.

3           So a good one here is just like any good summary

4  of purchases or sales.  What's one thing you'd expect that

5  any such document?  Dates, right?

6           THE COURT:  Right.

7           MR. CUPAR:  No dates here.  I we have Uzman

8  (phonetic), the owner.  Nothing like that here.  We don't

9  have the receipt number here correlating back to it, so.

10          THE COURT:  Well, let me just say, so I'm

11  looking.  So the receipt has $560.  And the third column,

12  which I don't even know what it corresponds to, the third

13  column, what it's supposed to be.  But for a Momentum Vape

14  Novelty, there's an entry of 560.

15          MR. CUPAR:  There could be that.  It could be

16  that.

17          THE COURT:  So is that it?

18          MR. TERAN:  That is, Your Honor.

19          THE COURT:  Okay.

20          MR. TERAN:  That is.

21          THE COURT:  So go ahead.

22          MR. CUPAR:  Yeah.  So that could be it.  But what

23  we don't have here is the details on this or any other

24  transactions.  And what we don't have is clarity on is this

25  the only Quick Fix sales, for example.  Are there other

1  ones, things like that?  So again we're we have to trust the

2  people who provided this to us to say this is it, nothing

3  else.

4          THE COURT:  Yeah.

5          MR. CUPAR:  And we have no other basis, again,

6  under that "show and don't tell" theory of confirming that.

7  That's my concern.

8          THE COURT:  Okay.  All right.

9          MR. TERAN:  So, Your Honor, so the initial

10 production --

11         THE COURT:  Oh, and then --

12         MR. TERAN:  Yeah.

13         THE COURT:  -- but then you said it was invoice

14 No. 32, page 32.

15         MR. TERAN:  Right.  Correct.

16         THE COURT:  Page 32, was it?  Do you have that?

17 Mr. Cupar?

18         MR. TERAN:  Yes.

19         MR. CUPAR:  I do.

20         MR. TERAN:  It's 36.

21         THE COURT:  36?

22         MR. TERAN:  Correct.

23         THE COURT:  Let me see what that looks like, just

24 to see.

25      (Pause in the proceedings.)

1              MR. TERAN:  And by the way, Your Honor, I should

2   point out that when we produced the spreadsheet, we did not

3   know about the -- I don't believe we knew about the receipt,

4   but it was included.

5              THE COURT:  Okay.

6              MR. TERAN:  So we're not hiding anything.

7              THE COURT:  Got it.

8              MR. TERAN:  All right?

9              THE COURT:  Okay, okay.

10             MR. CUPAR:  So this looks like the March for --

11  yeah, so even the receipt number, if you look at -- I'm

12  sorry to do this, I apologize for it.

13             THE COURT:  No, I'm looking at what you -- it

14  said before was receipt number --

15             MR. CUPAR:  It ended with, like an 864.

16             THE COURT:  68-something something 64.

17             MR. CUPAR:  64, yeah, the last two digits.

18             THE COURT:  And this is showing 1923.

19             MR. CUPAR:  Bingo.  That's my concern, things

20  like that.  There's just an inconsistency there that --

21  again, maybe it is, maybe it isn't.

22             THE COURT:  Which in discovery it might be

23  explained that electronically.  There's some reason, but I

24  get what you're saying.

25             MR. CUPAR:  Yeah.  So --

1          THE COURT:  At least it --

2          MR. CUPAR:  Yeah.

3          THE COURT:  -- it begs the question.

4          MR. CUPAR:  We did a better job, I feel like with

5  URZ's info in terms of understanding what they're doing than

6  what Mr. Teran has provided to us here and what URZ has

7  provided to us through Mr. Teran.  So --

8          THE COURT:  Okay.

9          MR. CUPAR:  -- that's my concern here.

10          THE COURT:  Do you have -- Mr. Cupar, do you have

11  any sense or knowledge at this point on volume of product

12  that you think Defendant is moving?

13          MR. CUPAR:  We don't know that.

14          THE COURT:  So you don't know because --

15          MR. CUPAR:  We don't know.

16          THE COURT:  -- Mr. Teran is representing it's a

17  small amount.  Whatever ultimately we get to the bottom of,

18  it's a small amount.  And you don't know one way or the

19  other at this point?

20          MR. CUPAR:  Exactly.

21          THE COURT:  Okay.  All right.

22          MR. CUPAR:  Yeah.  The other thing, too, just at

23  a high level with this client in the past, when it's dealt

24  with counterfeiting, it happens every three or four years.

25  What'll happen too is that when a sales made, what happens

1  is counterfeit product will get embedded in with the actual

2  product, too.  So that that's a very common counterfeiting

3  move, not just in this industry, but just really almost

4  every counterfeiting industry, especially when you're

5  selling multiple products at one time.

6          So there's just things like that in play here.

7  I'm not saying that did happen here.  I'm just saying that's

8  just something I'm on the lookout for.

9          THE COURT:  This product is a synthetic urine?

10          MR. CUPAR:  That's right.

11          THE COURT:  All right.  That was different I had

12  one that was a -- there's a product called "Ooze" and -- or

13  not a product, but it was a line called "Ooze," and it had

14  to do with batteries for vape pens.  And there were a lot of

15  these similar types of issues and difficulties in discovery.

16          MR. CUPAR:  Yeah.  And one thing, too, here is

17  again, there are -- as Your Honor pointed out, there are

18  times when it's a client issue.  You know, you ask a client

19  -- we've all been there.  We ask a client and you have to

20  ask a few more times and again, get more.

21          One other thing that just here that I'm concerned

22  about is the tough questions aren't being asked and the

23  tough answers aren't coming out, hence why we have the

24  proposed order that we do.  Again, I don't necessarily think

25  -- maybe I'm jumping ahead just for a moment, but I'll just

1  raise one more thing.  I found my co-counsel now, I found

2  earlier today even like there's a counterclaim, an

3  illegality counterclaim, which we think of back, you know, a

4  famous case was --

5          THE COURT:  I remember.

6          MR. CUPAR:  The Washington, yeah.

7          THE COURT:  Yeah, that teed up earlier.

8          MR. CUPAR:  Yeah.  One thing I just wanted to

9  point out, too, this is kind of what kind of a counsel issue

10  today I get worried about presenting here.  I'm happy to

11  make this an exhibit for this hearing.  This is a trademark

12  application, Your Honor, for a product named "Magnum Detox."

13  Mr. Teran filed.  He filed it on behalf of his client on

14  September 3rd, 2023.

15          And what it is, is it's for chemical compositions

16  and agents, namely synthetic urine.  It's actually a known

17  product out there.  If you actually go online, you'll see

18  it's a synthetic urine product.

19          Mr. Teran filed that for his client ten days.

20          THE COURT:  Actually he's arguing illegality

21  here.

22          MR. CUPAR:  Ten days before.

23          THE COURT:  He'll have an explanation for that --

24  which he's on his feet.  And I'm going to --

25          MR. CUPAR:  Yeah.

1    THE COURT:  -- let him give me that explanation

2 momentarily.

3    MR. CUPAR:  And you can see where I'm going with

4 this.  It's just things like that that the "say and do"

5 issue, I'm starting to see just that again and again back in

6 March again, no documents we had we you know, again, this

7 isn't our first rodeo.

8    THE COURT:  Magnum Detox has like nothing to do

9 with this case though, right?

10    MR. CUPAR:  That's right.

11    THE COURT:  There's that point that you want to

12 make about it, but it's not related to the products or the

13 parties that we're talking about right now, right?

14    MR. CUPAR:  Yeah.

15    THE COURT:  Okay.  Got it.

16    MR. CUPAR:  Discovery takes a village and, you

17 know, and sometimes it is a client issue solely.  Other

18 times it's client plus lawyer.  I'm just raising it here.  I

19 see both potentially.  And I think everyone needs to tighten

20 up on the URZ side based on what I'm seeing here.  And I

21 don't take stating that lightly.  That's all.

22    THE COURT:  All right, Mr. Teran, I believe that

23 you'll agree that Mr. Cupar deftly dropped something on me

24 to make you explain it, although it has nothing to do with

25 what's going on here at the hearing.  But as to the defense

1  that you've been wanting to raise, what do you want to say

2  about that document?

3         MR. TERAN:  Okay.  That is an entirely different

4  client.

5         THE COURT:  Oh, I get that, I understand that.

6         MR. TERAN:  Okay.  So they're doing research on

7  me.

8         THE COURT:  That's why I was asking.  It has

9  nothing to do with.

10         MR. TERAN:  So they're obviously doing research

11  on me.  That is an entirely different client.

12         THE COURT:  It's a credit to you.

13         MR. TERAN:  And they use --

14         THE COURT:  That's a compliment to you.

15         MR. TERAN:  Well no, Your Honor, Your Honor, hold

16  on.  The use of that product for which my client sells the

17  Magnum Detox is completely different.

18         THE COURT:  Okay.

19         MR. TERAN:  It is not --

20         THE COURT:  That's fine.

21         MR. TERAN:  -- as I understand it, it is not the

22  same thing.

23         Now, Your Honor, I want to point one thing out.

24         THE COURT:  It's like -- and I'll say, it's like

25  literally not an issue before me right now.

1          MR. TERAN:  It's not an issue.

2          THE COURT:  If that legality issue comes up,

3   that's going to be in evidence, then I'm going to understand

4   what the difference is, if any, between these products are.

5          MR. TERAN:  Right.

6          THE COURT:  Totally fine.  All right.  Go ahead.

7          MR. TERAN:  Another thing, Ooze -- Your Honor

8   brought up Ooze.

9          THE COURT:  Yes.

10          MR. TERAN:  I handled that case for another

11  client.

12          THE COURT:  Oh, that's right.

13          MR. TERAN:  It wasn't for this client.

14          THE COURT:  And you never had to appear.

15          MR. TERAN:  We never had --

16          THE COURT:  That was during COVID.  And so we

17  never had any in-person hearings.  Right?

18          MR. TERAN:  Well, we never had any discovery

19  issues.

20          THE COURT:  Yeah.

21          MR. TERAN:  You can look at the Record.  There is

22  zero discovery issues on that.

23          THE COURT:  Okay.  All right.  All right.

24          MR. TERAN:  And then I had another case.

25          THE COURT:  Is there a seizure in that case like

1  the Marshals went and like, went and seized product.  My

2  case manager is nodding her head yes.

3          MR. TERAN:  I think, I think, I think that's

4  right.  I think that's right.

5          THE COURT:  And that's nothing on you.  That was

6  like at the outset of the case.

7          MR. TERAN:  Correct, correct.

8          THE COURT:  They just want to make sure that

9  nothing was spoliated and they went and seized.

10          MR. TERAN:  Correct.  But there were no discovery

11  issues.  I want to point that out.

12          THE COURT:  Okay.  All right.  All right.  I take

13  that and I didn't recall that you were on that case.  So I

14  wasn't like saying that directed to you.

15          Go ahead.

16          MR. TERAN:  Okay.  And then I had another case

17  with Ooze again -- well with this client, URZ, it was

18  handled by another judge.

19          THE COURT:  It was handled by another judge?

20          MR. TERAN:  Yes.

21          THE COURT:  Okay.

22          MR. TERAN:  And there wasn't a single discovery

23  dispute in that case either.  And you can look at that.

24          THE COURT:  Who was that before, if you recall?

25          MR. TERAN:  I'm sorry?

1          THE COURT:  Who was that before -- here in

2    Houston?

3          MR. TERAN:  Yes, here in Houston, in this

4    courthouse.  I can't remember the name, Your Honor, I

5    apologize.

6          THE COURT:  All right.  That's okay.

7          MR. TERAN:  There was no single discovery dispute

8    in that.

9          THE COURT:  Okay, all right.

10          MR. TERAN:  And, you know.

11          THE COURT:  All right.  So that was just the one

12   little evidentiary point about what had been produced.  And

13   you'd point me to a couple of things.

14          What else did you want to argue about?  What

15   you've done?  I guess one question I've got is what

16   electronic search of electronic databases has been done, to

17   your knowledge, if any?

18          MR. TERAN:  Right.  So we have produced, as I

19   understand it, my client has like a spreadsheet generating

20   system that creates a spreadsheet of their sales.  We have

21   produced those spreadsheets.  The comment that came back to

22   us through the dispute letter was, well, we don't have dates

23   to these transactions and we would like to see the actual

24   invoices.  So we did.  And that, you know, that Your Honor

25   was not, as I understand it, pulling out these invoices was

1  not as easy as pulling out the spreadsheet because these are

2  invoices.  I guess they had to look or something like that.

3          And then also the invoices from the supplier.  I

4  think two of the three invoices from suppliers were

5  handwritten.  So, so, you know, those were not

6  electronically.  And so we had to search for those, which we

7  did.  We had originally produced a spreadsheet from our

8  system indicating how many we had purchased and from whom,

9  but they wanted to see the actual invoices pursuant to the

10 discovery dispute letter that they submitted to Your Honor.

11 So we went and we looked.  We looked through, as I

12 understand it, they looked through stacks of documents

13 looking for those invoices which are handwritten.

14          And we did.  We found them.  We produced them.

15          As I understand it, Your Honor, we have produced

16 all the invoices, all the receipts for our purchases, for

17 our sales.  There were no communications.  If you look at

18 the spreadsheet that we produced, the number of units that

19 were sold of these products is rather minimal.

20          As I indicated in my brief, my client sells a

21 wide variety of products.  I want to say hundreds, maybe

22 thousands.  I'm not sure, of different types of products.

23 and this is, you know, it's a small unsophisticated business

24 where sometimes they'll just -- they'll sell whatever comes

25 their way.  And this happens to be one of those which came

their way.  And they sold a very small amount.  But from our indication these are not counterfeits.  The sources for which we produced the receipts and invoices, we believe are authorized resellers of these products.  And their private investigator took 112 units of our products before this case started without us knowing.  And I haven't seen not even an allegation that any one of those 112 units that we sold to their private investigator were counterfeits.

THE COURT:  Got it.  So were counterfeits, so you're saying legitimate source of supply or grey market or what?

MR. TERAN:  No.  A legitimate source of supply, we believe there were authentic.  They came, they derived from the Plaintiff.

THE COURT:  As in your theory is that Spectrum sold legitimately to someone who sold legitimately to your client?

MR. TERAN:  Correct.

THE COURT:  Okay.  And so our invoices identifies the source.  We believe those are authorized resellers from Defendant.

THE COURT:  Okay.

MR. TERAN:  And one of the issues in our discovery dispute is we would like to have a list of their authorized resellers so we can confirm that.  But we haven't

1  gotten that.

2           THE COURT:  Okay.

3           MR. TERAN:  That is -- and like I said, Your

4  Honor, that is my understanding.

5           THE COURT:  I would -- there's my prior orders

6  here indicate that there have been -- I had prior hearings

7  on discovery in this matter.  They indicate that I've had

8  concerns about the fullness and completeness of compliance.

9  And that's still not allayed here.

10          And what I'm hearing is that there is an

11 unsophisticated client here in Houston who has been left to

12 its own devices to do a record search for production that

13 complies with Federal discovery rules.

14          And I think that Plaintiff shows reasons why

15 there's at least some doubt as to whether that has been

16 fully stated.  I have it pending in front of me as a motion

17 for sanctions.  I am thinking what I'm going to do here is a

18 further order that is not an order of sanctions, but that is

19 in line with some of the requests that Spectrum Laboratories

20 is asking for, specifically, how discovery will proceed now

21 in the future, which I would enter not as a sanction, but as

22 an order to comply with discovery obligations.

23          And I would reserve further consideration of

24 whether sanctions are in order, depending on the level of

25 cooperation and turnover of things that go according to the

1 way that Spectrum has asked for it. Put to one side any

2 question about attorney's fees to this point or striking of

3 defenses, et cetera. I'm simply talking about the request

4 as to what the discovery would be. That's what I'm thinking

5 about doing.

6          I'm going to take up those categories one by one.

7 But Mr. Teran, to the extent that you recall the list of

8 what they've asked for, do you have general concerns or

9 opposition to what I've stated? I want to have further

10 conversation about as to whether that's proper or not,

11 because I'm trying not to have to get all the way to the

12 point of finalizing a decision as to sanctions, but I would

13 like discovery to actually happen in this case.

14          So what is your thoughts?

15          MR. TERAN: Yes, Your Honor, we have no objection

16 to discovery. We are more than willing to comply with any

17 discovery order. I would like to discuss, Your Honor, your

18 comment about the previous hearings.

19          THE COURT: Okay.

20          MR. TERAN: The issue, if you're -- if I may,

21 Your Honor?

22          THE COURT: Yeah, please.

23          MR. TERAN: The issue in those -- in the -- in

24 that previous hearing, our concern was that, one, we were

25 not a party to this suit, and we received a subpoena

1  demanding we disclose our confidential information.  We were

2  not even a party to this suit.  We were not even accused of

3  doing anything wrong.

4           And when I responded, I said, what is this Quick

5  Fix, Quick Fix product?  It wasn't properly defined in the

6  subpoena, and I believe it wasn't properly defined because

7  they were trying to dance around the synthetic urine.  But

8  nevertheless --

9           THE COURT:  But as I recall it, in the context of

10  what was happening before me, I didn't get an appearance

11  from you objecting and that --

12           MR. TERAN:  Oh, no, I did.

13           THE COURT:  I mean, eventually, yes.  But first

14  it was stonewalling and just not responding.  If I'm

15  remembering it right.

16           MR. TERAN:  Yeah, we were not -- we were not a

17  party to the case.

18           THE COURT:  Got it.

19           MR. TERAN:  I wasn't even brought in to the case.

20           THE COURT:  But there can still be third-party

21  discovery.

22           MR. TERAN:  Well, not related to our private

23  sales.  I mean, third-party discovery would have to be

24  related to the case that is at issue, which was against

25  Royal Fragrances.  So the proper discovery would have been

communications or sales with or to Royal Fragrances. That was not what was requested. They requested our sales information of this product as if they were accusing us of counterfeiting already, when a case hadn't been filed against us.

And then when I got involved, my first response was, what is this? It wasn't properly defined. And if you recall, Your Honor, I did appear at a first hearing, and that was my first objection to Your Honor. This is not properly defined. I'm not really understanding what this product is.

And Your Honor issued an order saying, okay, we'll make this very simple. Anything related to Quick Fix, anything related to the name Quick Fix has to be produced. And honestly, Your Honor, that did make it simple because we just went after the name. We were not looking for the definition of the product.

THE COURT: Right.

MR. TERAN: And which were, you know, what we produced the spreadsheet that we did and, and things of that nature. But that clarified the issue. I have no objection. We have no objection to any discovery order, Your Honor, we will comply.

THE COURT: Okay.

MR. TERAN: It is not my custom not to comply

1  with discovery orders.

2             THE COURT:  I got that, I understand that.

3             Mr. Cupar --

4             MR. CUPAR:  Just briefly.

5             THE COURT:  -- do you stand up to say something?

6             MR. CUPAR:  Yeah, two key points there.  I just

7  want to make sure the Record is clear.  I think Mr. Teran's

8  inaccurate about factually something here.  The Court --

9             THE COURT:  Procedural, as to procedure?

10            MR. CUPAR:  Yeah.

11            THE COURT:  Okay.

12            MR. CUPAR:  Yes, as to procedure, the Court

13  granted Spectrum the right to identify URZ as a Defendant

14  back in June.  The Court's -- so -- so in in August 29th,

15  I'm having -- it's Docket No. 63, just to be crystal clear,

16  the Court had then with URZ as a party, a hearing on this

17  and ordered on September 5th as a follow up, a specific

18  order to compel.

19            And Mr. Teran keeps arguing that he didn't

20  understand that discovery.  No, that was even before that.

21            THE COURT:  No, no, no, but I get it.  But by the

22  time, I mean, obviously my first order that's directly

23  pertinent here, I have Docket 63 and Docket 80 --

24            MR. CUPAR:  Yeah.

25            THE COURT:  -- in front of me from August and

1  November, there had been some discovery issues previously,

2  and I may have spoken too broadly as to what was preceding

3  URZ being added as a Defendant in June or whenever that was.

4          MR. CUPAR:  That's right.

5          THE COURT:  So I think Mr. Teran was categorizing

6  as to that, but you're also correct that at some point URZ

7  has been here as a named Defendant and by the time the

8  August hearing occurred, URZ is on the -- I mean, it's

9  Spectrum Labs versus URZ Trends.  That's the Docket caption

10  at 63.

11          MR. CUPAR:  Yeah.

12          THE COURT:  All right.

13          MR. CUPAR:  And another point I would just want

14  to re-raise kind of going to this argument, whether it's at

15  the time URZ or URZ became a party or prior to that, during

16  the subpoena phase, the first request for Mr. Teran here was

17  for a protective order, which we complied with.  We said no

18  problem.  We understand that there could be some information

19  that we agreed to that, we entered a protective order, and

20  then subsequently, Mr. Teran represented there was no

21  documents, again.

22          So -- which was very troubling to say the least,

23  at that time and still is now that that request is made.  So

24  again, it goes back to this issue that we keep --

25          THE COURT:  How was it that -- remind me how it

1  was that with Royal Fragrances is the first named Defendant?

2  It had gotten to the point of you wanting discovery from URZ

3  and then they were then added?

4          MR. CUPAR:  Yeah.  And I'm, I --

5          THE COURT:  I'm trying -- I don't --

6          MR. CUPAR:  -- don't hold me too much to it.  But

7  generally speaking what happened was Royal Fragrances -- in

8  short, what I think I can represent here correctly is that

9  they they pointed the finger at URZ and said that they

10  received, either directly or indirectly, their orders

11  from --

12          THE COURT:  That URZ had sold to Royal

13  Fragrances.

14          MR. CUPAR:  -- URZ and that included counterfeit,

15  I believe.  Yeah, that's right.

16          MR. TERAN:  Your Honor, may I speak to that

17  briefly?

18          THE COURT:  And then he's simply relating what a

19  Defendant had said.

20          MR. TERAN:  That's inaccurate, Your Honor.

21          THE COURT:  And then you're saying that like

22  that's not --

23          MR. TERAN:  It is inaccurate because --

24          THE COURT:  -- what was Royal Fragrance.

25          MR. TERAN:  Yeah.

1          THE COURT:  Is it inaccurate that Royal Fragrance
2    has never said that?
3          MR. TERAN:  As far as we know.
4          THE COURT:  As far as you know.
5          MR. TERAN:  And here's why.
6          THE COURT:  Okay.
7          MR. TERAN:  And here's here's why:  In the
8    Complaint that they filed against us, they indicate that a
9    representative of Royal Fragrance gave an affidavit, a sworn
10   affidavit identifying us.  And I got a copy of that sworn
11   affidavit through discovery.  We are not named in that
12   affidavit at all.
13         THE COURT:  Okay.
14         MR. TERAN:  So that's -- you know, I would like
15   to see how it is that Royal Fragrance, you know, pointed the
16   finger at us because what I've seen so far in the affidavit,
17   they never did.  So we haven't sold any counterfeits -- as
18   far as we know, as far as I know.
19         THE COURT:  As far as you know, okay.
20         MR. CUPAR:  And my response to Mr. Teran, I mean,
21   if this is all true, that what Mr. Teran is saying, he would
22   have -- and his client would have been providing this back
23   in March to 2023, you would have never seen these issues.
24   If all true, he would have complied with discovery.
25         Mr. Teran has been incredibly just -- I'm not

1    going to go there.

2              THE COURT:  Oh, don't.  Don't do that.

3              MR. TERAN:  I won't go there.

4              THE COURT:  And it's -- and Mr. -- that would

5    just invite Mr. Teran to stand up and say, look, I'm

6    entitled to --

7              MR. TERAN:  Right.

8              THE COURT:  -- push back on discovery that you're

9    not entitled to.  And so that's what he would say.

10             MR. CUPAR:  Yes.

11             THE COURT:  Right?  So --

12             MR. TERAN:  We're open to discovery, Your Honor.

13             THE COURT:  All right.

14             MR. TERAN:  We will comply with discovery.

15             THE COURT:  All right.  So then, as to looking

16   now at -- I'm looking at docket -- the motion itself is at

17   Docket 83, pages 8 and 9.  There's a request as to -- there

18   are numbers One, which has several sub-categories -- one,

19   two, three, four, and I guess seven, because that's just

20   simply a warning, which I've already given.

21             So one, two, three, four and seven being my order

22   coming off of this hearing on the discovery that should go

23   forward, not five as to pay legal fees at this point, not

24   six as to striking counterclaims and affirmative defenses at

25   this point.

1          Mr. Teran, do you have that in front of you?  Do

2  you want to argue anything about that?

3          MR. TERAN:  Your Honor is looking at Document 83?

4          THE COURT:  It is -- it is intrusive.  But I had

5  previously said by my prior order they could bring a motion

6  for intrusive discovery, which they've done.

7          MR. TERAN:  Yeah, I mean, we'll do that, Your

8  Honor, I mean.

9          THE COURT:  What's that?

10          MR. TERAN:  We're fine with that.  We'll do that.

11          THE COURT:  Okay.

12          MR. TERAN:  I mean, you know, if we don't have to

13  pay for it, obviously, if they're going to, you know, guide

14  us through the process, send their team over and look at our

15  other records, you know, we're we're okay with that.

16          THE COURT:  All right.

17          MR. TERAN:  We have nothing to hide.

18          THE COURT:  Mr. Cupar?

19          MR. CUPAR:  I will speak to that.  I think on the

20  third-party vendor side, there's been enough.  I won't use

21  the word that I'm thinking -- issues that I do think URZ

22  should pay for that third party, this vendor for the cost

23  related to that as part of the discovery, just like we would

24  for our side of the discovery as well, Your Honor.

25          I do think that's a step too far.  I think they

1  need to pay for their own vendor here for third party to go

2  in and do this searching.  So I don't think it's fair for us

3  to have to pay for that here at this point, especially with

4  all the things that have happened.

5       THE COURT:  How much do you think it costs to

6  comply with the order that you're asking for?

7       MR. CUPAR:  For the third-party vendor, I'm not

8  sure what they would charge for doing that searching, based

9  on custodians, because I don't know how many custodians

10 there are.  The keywords are the easier part.  Quick Fix,

11 Spectrum, there's a few others along those lines.  I just

12 don't know how many custodians they have, based on what

13 would be necessary.

14      Mr. Teran might be able to answer that.

15      If there's only -- is he represented?  It's a

16 small business.  I'm assuming a few employees.  I can't

17 imagine it being difficult or expensive.

18      MR. TERAN:  Your Honor, I would object to costs.

19 I -- there's no basis for it, one, because we haven't hidden

20 anything.  We haven't -- they haven't shown.

21      THE COURT:  And so -- and so I just want it very

22 clear, Mr. Tehran.  I'm going to -- when I order this

23 discovery and this discovery is done, you believe, based on

24 what your client has told you, there's going to be -- there

25 might be one or two hits somewhere that you -- that they

didn't gather.  So I'm not going to hold you that there'll

be nothing else.  But from what you've heard, if anything is

found from all of this, it will be not a substantial

production.  Is that your understanding?

MR. TERAN:  My understanding from my client, a

very clear representation, after me indicating to my client

the importance of our compliance with discovery orders, they

have represented to me that they have done a full search,

and they have found everything that we have produced.

THE COURT:  Okay.

MR. TERAN:  Now, I don't know that first hand,

right?

THE COURT:  I know.

MR. TERAN:  Okay.

THE COURT:  That's what --

MR. TERAN:  But that is the representation.

THE COURT:  But they say they've done a search

and they've given you everything.

MR. TERAN:  Right.  And I have not heard anything

from the Plaintiff to indicate otherwise.  They have brought

up the receipt.  I have shown that we have produced

documents related to the receipts.

THE COURT:  But then there's unexplained number

differences and things.  I'm not saying somebody's

falsifying something behind the scenes, but --

1          MR. TERAN: I think -- yeah, I think that he

2 pointed a receipt number versus an invoice number. I don't

3 know what that is, but I have no reason to doubt that that

4 invoice that we produced is related to the receipt that was

5 issued for that transaction because the date matches, the

6 quantity matches, the price matches, the name of the buyer

7 matches.

8          THE COURT: Okay.

9          MR. CUPAR: One more thing, Your Honor. I'm

10 sorry to keep adding.

11          THE COURT: Go ahead.

12          MR. CUPAR: Just an important one, though, I

13 think, just so we're clear on the Record, one thing that we

14 didn't -- we also didn't see in the opposition to our motion

15 for sanctions and it may be something you may want to

16 consider asking Mr. Teran, would be a hold letter. We don't

17 know if there's a litigation hold letter at the time.

18          So back when we served the subpoena, my

19 expectation would be that Mr. Teran provided some sort of

20 litigation hold letter to his client to make sure there's

21 no, for example, deletion of texts. If there's texting,

22 some backdoor texting, things like that, no emails, nothing

23 like that.

24          So one thing I didn't see in the opposition brief

25 was anything there, especially in view of the fact that the

1  initial representation was back in March, no documents.  And

2  here we are, there's documents and -- and there's a

3  sanctions -- well, at least not a sanctions order, but an

4  order compelling this electronic production, too.

5          So I'd like to -- I think it would help this case

6  to understand better what has been instructed at that level,

7  even if there's a litigation hold in writing, which is a

8  common practice in our --

9          THE COURT:  Is there any litigation hold --

10          MR. TERAN:  Yes, there is, Your Honor.

11          THE COURT:  -- letter?

12          MR. TERAN:  Yeah.

13          THE COURT:  Do you know when when you issued that

14  approximately?

15          MR. TERAN:  When we received the Complaint, I

16  believe.

17          THE COURT:  Okay.

18          MR. TERAN:  That's -- that's customary.

19          THE COURT:  Customary.  I just want to be sure.

20  Okay, good.

21          All right.  I have concerns about the fullness of

22  discovery compliance from the Defendants, as I've said.

23  Plaintiff has said that -- though actually you really don't

24  have any understanding of how much quantity URZ Trends might

25  be actually producing.  I do think that this discovery, if

1  you want it, I'll award it.  But as in Order it.

2         But Spectrum is going to have to front the cost

3  on it.  But if, when it's done, it shows that there's what

4  could be argued as substantial non-compliance with

5  production to-date, you can ask to shift costs at that

6  point.  Okay?

7         MR. CUPAR:  hank you, Your Honor.

8         THE COURT:  I think that that's -- I think that's

9  a fair and relevant way to proceed on this, because

10  Mr. Teran is trying to say, hey, they've at least told me

11  they've done everything, and if it turns out that they did

12  or it's closely approximate to everything, then they

13  shouldn't have had to pay for this, shouldn't have gone

14  around in circles so much to get to this point.  But if you

15  want to pursue that discovery, you'll front the cost and

16  then you can try to shift it later if it is believed

17  appropriate based on what's then turned over.  All right?

18         MR. CUPAR:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. TERAN:  I'm okay with that, Your Honor.

21         THE COURT:  Okay.

22         MR. TERAN:  If you can lay out the parameters of

23  what the search is going to be.

24         THE COURT:  I am intending -- there is a specific

25  order.  I try not to on some orders.  When things are being

1  specifically asked for by parties, and this is certainly

2  true like when parties want default judgments or anything

3  having to do with like a mortgage dispute.  When I've got

4  it, I'm always sort of like, make sure you've asked for the

5  order that you want to live with, that it's clear enough.

6  They've asked for a specific order.

7         And so and when I read it, it seems clear enough

8  to be followed if the parties are cooperating in good faith.

9         Is there anything that appears unclear right now,

10  Mr. Teran, that you think would require a little further

11  specification?

12         MR. TERAN:  For example, we're looking at

13  Document 83, correct?

14         THE COURT:  Docket -- yeah, Document 83.  And

15  it's 00 there's Roman II, what sanctions are appropriate?

16  And then there's a list of one through seven.

17         MR. TERAN:  On page eight.

18         THE COURT:  Yeah.

19         MR. TERAN:  Okay.  Oh.

20         THE COURT:  Starting on page eight and it goes

21  over to page nine.

22         MR. TERAN:  Okay.  Your Honor, for example,

23  number one, it includes owners or representatives.  You

24  know, that that presumably would include every employee that

25  they have.  I'm not necessarily sure that that's -- that

1  that's fair.  And also the owners, you know, it should be

2  the -- it should be the -- it should be the, the Defendant

3  that is exposed to this, their operations, their emails.  It

4  shouldn't be the personal accounts of the owners or the

5  employees.

6          THE COURT:  Now, to be clear, Mr. Cupar, as I

7  understand the requested order, there's a third-party

8  neutral ESI vendor who gathers all this electronic

9  information and then does a search for relevancy terms.  And

10 that's the only thing that's turned over. Spectrum is not

11 otherwise seeing anything else in what's being gathered in

12 the electronic search initially, right?

13         MR. CUPAR:  That's right.

14         THE COURT:  It has to have a relevant search

15 terms hit.

16         MR. CUPAR:  Yes, sir.

17         THE COURT:  Okay.

18         MR. TERAN:  And also communication with counsel,

19 Your Honor, I would certainly block that out.

20         MR. CUPAR:  That's the law, of course, privilege.

21         THE COURT:  And is that you or is there other

22 counsel?

23         MR. TERAN:  Me, for sure.  I don't know if they

24 had other counsel before.

25         MR. CUPAR:  And if that's the case, of course,

1  Your Honor, that's a privilege log.

2          THE COURT:  Right. That -- well, it has a hit and

3  so on privilege it would be turned over.  It would be

4  identified by Bates range as a hit with counsel, and then

5  it'd be up to counsel.  You wouldn't see it, but counsel to

6  URZ would see it and would produce a privilege log based on

7  that.

8          MR. CUPAR:  That's right.  And one more thing.  I

9  think our protective order even has a clawback provision.

10  So let's say if something did get produced that's privileged

11  -- yeah.

12          THE COURT:  Yeah.  But you really need to try

13  to --

14          MR. CUPAR:  Avoid that.

15          THE COURT:  -- the privilege getting out.

16  because the precedent says the cat is then out of the bag,

17  as it were.

18          Did you have a specific order in front of me to

19  implement this?

20          MR. CUPAR:  I provided it as 83-6.  So we do have

21  a proposed order.  It includes obviously 1 through --

22          THE COURT:  Yeah.

23          MR. CUPAR:  Huh, the numbering is a little

24  different.

25          THE COURT:  Do you have a copy of that or,

1  Jennelle, can you print that for me?

2          MR. CUPAR:  Yes.  Your Honor wants it sent by

3  email or -- I'm sorry, I didn't hear your request.  I'm

4  sorry.

5          THE COURT:  I was asking, do you have a copy of

6  it?  Or my case manager can print me a copy if you don't.

7          MR. CUPAR:  I do have it, Your Honor, of the

8  proposed order?

9          THE COURT:  Of the proposed order, I just want to

10  take a look at it.  I had not seen that.

11          MR. TERAN:  And, Your Honor, I would also like to

12  point out an item.  Two bank accounts.  Nothing in the bank

13  accounts will be related to the Quick Fix product because no

14  check, no transaction identifies the product.  It's always

15  checks that are issued by the Defendant to third party, or

16  checks that are received by the Defendant from third

17  parties.  It doesn't identify the product, so.

18          MR. CUPAR:  I don't agree with that, Your Honor.

19  Here's why on that point specifically.  But counterfeiters

20  run multiple bank accounts, so we need to know each bank

21  account.

22          MR. TERAN:  Well, Your Honor, now we're being

23  tagged as counterfeit.

24          THE COURT:  If -- if -- well, that's the

25  contention.  That's if you disagree with it.

1          MR. CUPAR:  That's the contention.

2          THE COURT:  So got it.  I'm still thinking about

3    it.

4          MR. CUPAR:  If I may approach?

5          THE COURT:  Can you hand that up, please?  Thank

6    you.

7        (Pause in the proceedings.)

8          MR. TERAN:  A small point of note on that, Your

9    Honor.  It says 1 through 6.  The last paragraph below 6

10   would have been 7.  It was just a typo.  It's the same

11   language as in the --

12         THE COURT:  Is hereby instructed that failure to

13   comply?  Got it.

14         MR. CUPAR:  Yep.

15         MR. TERAN:  Your Honor, on number four, I would

16   like to have, you know, some time limitation on that.  You

17   know, if they're going to come into our physical location

18   and conduct a search, one, I would --

19         THE COURT:  A time limitation for what's searched

20   for or when that would happen?

21         MR. TERAN:  Both when -- we would like it to be,

22   you know, not within business hours so as to not interrupt

23   with the operation.  And then, you know, we don't want it to

24   last, you know, forever.

25         MR. CUPAR:  I don't read that proposed language

1  to be anything different than that, Your Honor.  We'd be

2  reasonable, of course.

3        THE COURT:  Well, yeah.  But y'all both think

4  each other is not reasonable in discovery to this point.  So

5  we're trying to specify some things.

6        So on the bank account, the bank account is

7  identified.

8        That's -- you just simply want them to identify

9  every bank account and then whatever you can go third party

10  subpoena from the banks, you can go, but they're not having

11  to do anything on that.  They just have to tell you, here's

12  our bank accounts.

13        MR. CUPAR:  Yes, sir.

14        THE COURT:  That's all you're asking for?

15        Understood?

16        MR. TERAN:  Well, no, I understand, Your Honor,

17  but the bank accounts are not linked to Quick Fix. They're

18  running an operation to which involves --

19        THE COURT:  It may or may not be.  And discovery

20  is broad towards the production of anything that might be

21  relevant.  And I can't make a determination about whether it

22  is or is not relevant.

23        There will be an order to identify the bank

24  accounts.  And then when the subpoenas go, if you're working

25  with them, I'm sure they're going to contact you as to

1  whether there's any opposition to discover -- that discovery

2  request.  You can take it up with the banks.  The banks can

3  bring it to me, whatever.

4           But in terms of simply identifying the bank

5  accounts, that's going to be part of this order now.

6           MR. TERAN:  Okay.

7           THE COURT:  Because that's all that's being asked

8  for, okay.

9           All right, here's my order coming off of this

10 hearing:

11          I am going to enter an order that is

12 substantially in the form of that proposed at Docket

13 Entry 83-6, subject to it not including point number five

14 and point number six there.

15          The parties are ordered to confer as to how the

16 production of privileged matter will proceed, like

17 accounting for the fact that there might be hits that

18 disclose privilege.  And that I would like some provision in

19 there for cooperation as to this not occurring within

20 business hours and otherwise specifying reasonable

21 conference and accommodation between both parties.  All

22 right?

23          And if there's any specifics you all want to work

24 out and put into the Order, great.  But other than that,

25 this will happen so that business isn't disrupted or caused

1  concern to customers.  And we'll go from there.

2          MR. TERAN:  And one more thing, Your Honor.  On

3  number one, they want to search hard drives and servers and

4  cell phones and laptops.  You know, one, it has to be

5  related to the business.

6          THE COURT:  Yes.

7          MR. TERAN:  It can't be personal devices.

8          THE COURT:  It's --

9          MR. TERAN:  And two, if they take our computers

10  away from us our operation --

11          THE COURT:  They won't.  It would be -- it would

12  be for imaging.

13          MR. TERAN:  Okay.  But it would have to be done

14  outside of business hours.

15          THE COURT:  Right, right.  And identifying

16  electronic devices like that is not a seizure of those

17  devices, as I understand it.  It's for imaging of them.

18  correct?

19          MR. CUPAR:  Yes, sir.

20          THE COURT:  All right.  In a secure fashion.

21          And as to personal devices, the problem is that I

22  don't know who the employees are or how many people are

23  involved, but I think there's a high likelihood that

24  employees use personal devices to conduct company business.

25  I think that's just the nature of what's going on.

1          Is there -- Mr. Cupar, is that what you're

2   suspicion would be as to the potential for relevant

3   evidence?

4          MR. CUPAR:  That's exactly right, Your Honor.

5          THE COURT:  Mr. Teran, do you -- what's your

6   thought?

7          MR. TERAN:  Yeah, well.

8          THE COURT:  I'm trying for it.

9          MR. TERAN:  Yeah.

10          THE COURT:  It needs to be intrusive, I

11   understand that, but I understand the concern.  But again,

12   this is all going towards a third-party ESI vendor so that

13   everything that's being gathered isn't necessarily going to

14   Spectrum.  It's simply being gathered and preserved.

15          MR. TERAN:  I understand, Your Honor, but one

16   thing I would point out is that I do not represent the

17   employees.  Right?  I represent URZ Trends, LLC.

18          THE COURT:  Right.

19          MR. TERAN:  So I can't speak to the employees.  I

20   can't speak to their willingness to turn this over.

21          THE COURT:  Right.

22          MR. TERAN:  That is beyond my control, and I can

23   instruct them to do so.

24          THE COURT:  It's also -- it is -- which one are

25   we looking at in particular?  That's as to number?

1    MR. TERAN:  It's number one, all of number one it

2    calls for -- if you look at (1)(C) hard drive, server, cell

3    phones, laptops, desktop computers, tablets, other

4    electronic devices.  And now would this be devices that are

5    in their home or at the location?  You know, I mean, if they

6    have family photos, their kids, and medical information --

7    THE COURT:  That URZ, including its own

8    representatives' uses for any purpose, and so it's

9    employees.  And so there's a conversation about whether

10   they've used any of those devices for an URZ business

11   purpose, and if so, it's within the ambit of the order.

12   MR. CUPAR:  Yes, Your Honor.

13   THE COURT:  Which itself is going to have a trust

14   but verify component.

15   Mr. Teran, you need to admonish your client and

16   for your client to -- whether it's you directly to the

17   employees that with electronic record searches, what one

18   person says is or isn't there, it's going to be verified

19   from so many other different ways as to what is circulating

20   around out there.

21   And so, as I've said, if anybody's

22   misrepresenting what they're doing or what they're producing

23   and it comes around that that was a misrepresentation, there

24   will be consequences in this Court.  All right?

25   Have I referred you all to my order in *Thomas*

1  *versus United Airlines* at this point?

2        MR. TERAN:  No, Your Honor.

3        THE COURT:  So find that one.  There's two.  I am

4  literally not saying that anything like this is going on,

5  but when we raise the invoice, there's the receipt, and then

6  the numbers don't match on the other invoice.  What could

7  possibly account for that?  And *Thomas versus United*

8  *Airlines*, which had an ADA complaint within it, someone who

9  had purported to take leave because of an ADA condition to

10  go to the hospital, apparently didn't go to the hospital,

11  but then when United Airlines was concerned about that and

12  started digging into it, she then later went to the hospital

13  two weeks later and got an invoice from that and switched

14  the invoice numbers.

15        And ultimately, I'm not sure if that law firm is

16  practicing anymore, but I referred the law firm and the

17  Plaintiff to the AUSA for consideration of prosecution for

18  perjury because evidence had apparently been falsified in

19  that case and given to and sworn to by counsel.

20        So again, I take it very seriously, and I see

21  what the problems are when parties' clients are not

22  adequately counseled about what their obligations are going

23  to be.  And so if URZ doesn't understand what the potential

24  consequences are for complying with federal discovery, now

25  that order can be reviewed and they can understand that it

1   can be quite severe indeed.  Okay?

2            MR. TERAN:  Your Honor, one thing regarding the

3   hold letter, I can't find it on my records that it was sent,

4   so we may not have sent the hold letter.

5            THE COURT:  Okay.  All right. All right.  Well,

6   obligations about spoliation arise independently of whether

7   there's a hold letter or whether there's a demand.  There

8   are rules about that once evidence -- once there is a claim,

9   evidence about that needs to be held.  And so if it turns

10  out things have not been preserved in a way that looks

11  illegitimate, we'll take that up when we get there -- if we

12  get there.  Don't know at this point.  All right?

13           MR. CUPAR:  Yes, Your Honor.  Thank you.

14           MR. TERAN:  Thank you, Your Honor.

15           THE COURT:  All right, anything else?  Any other

16  questions?

17           MR. CUPAR:  No, sir.

18           MR. TERAN:  No.

19           THE COURT:  All right.  Very interesting.  Thank

20  you for flying in.

21           MR. TERAN:  No problem, Your Honor.

22           THE COURT:  All right.

23           MR. CUPAR:  That makes two of us, by the way. I

24  get from Cleveland.  So, yeah.

25           THE COURT:  What's that?

1              MR. CUPAR:  I came in from Cleveland.  It's a
2    little warmer here, so.
3              THE COURT:  I thought -- you're not Houston?
4              Oh.  Okay.
5              MR. CUPAR:  My co-counsel is, but --
6              THE COURT:  Well, no, no, no.  I looked at the
7    docket sheet and I only know -- oh, Cleveland, Ohio.  There
8    it is.  First one, and then -- but the last attorney, I just
9    looked at the bottom of the page, and that was a Houston
10   address.
11             MR. CUPAR:  Yes.
12             THE COURT:  All right.  Well, you're welcome,
13   since it's warm here.  All right.
14        (Laughter)
15             MR. CUPAR:  Right.
16             THE COURT:  Thank you all.  We're adjourned.
17        (Proceedings adjourned at 3:43 p.m.)
18
19
20
21
22
23
24
25                        *  *  *  *  *

1           I certify that the foregoing is a correct

2    transcript to the best of my ability produced from the

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #68241

10   DATE FILED:  FEBRUARY 19, 2024

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25