UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SPECTRUM LABORATORIES, LLC,
          Plaintiff,

v.

URZ TRENDZ, LLC,
          Defendant.

**Case No. 4:22-CV-03705**

**Hon. Judge Charles Eskridge**


**JURY TRIAL DEMANDED**


**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................. 6

II. SUMMARY OF THE ARGUMENT .......................................................... 7

III. LEGAL STANDARD FOR SUMMARY JUDGMENT ........................................ 8

IV. PLAINTIFF'S REGISTRATIONS ARE INVALID FOR UNLAWFUL USE ......... 9

    A. Plaintiff's Illegal Use Is Inferred Since Plaintiff Asserted it's 5th Amendment Rights Before The U.S. Congress ...................................................... 12

    B. Plaintiff Failed to Provide Evidence of Legal Use ............................................. 14

    C. In the Alternative, the Court Must Stay This Case Pending Resolution of Cancellation Proceeding Filed With the PTO ..................................................... 16

V. PLAINTIFF'S CLAIMS MUST BE DISMISSED DUE TO UNCLEAN HANDS 17

VI. THE COUNTERFEITING CLAIM MUST BE SUMMARILY DISMISSED ........ 18

VII. THE TRADEMARK INFRINGEMENT CLAIM MUST BE DISMISSED FOR LACK OF EVIDENCE ................................................................................. 21

VIII. THE TRADEMARK DILUTION CLAIM MUST BE DISMISSED BECAUSE PLAINTIFF'S TRADEMARKS ARE NOT FAMOUS ........................................... 23

IX. CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Adickes v. S.H. Kress & Co.
398 U.S. 144 (1970).................................................................9

AK Futures LLC v. Boyd St. Distro, LLC
35 F.4th 682 (9th Cir. 2022) ...............................................10

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986)................................................................9

Avery Dennison Corp. v. Sumpton
189 F.3d 868 (9th Cir.1999)................................................24

Beardsall v. CVS Pharmacy, Inc.
953 F.3d 969 (7th Cir. 2020) ...............................................22

Berckeley Inv. Grp. Ltd. v. Colkitt
455 F.3d 195 (3d Cir. 2006)..................................................22

Celotex Corp. v. Catrett
477 U.S. 317 (1986)..........................................................9, 22

Coach, Inc. v. Asia Pac. Trading Co.
676 F.Supp.2d 914 (C.D. Cal. 2009) ...................................20

Coahoma Chem. Co., Inc. v. Smith
113 USPQ 413 (Comm'r Pat. 1957).....................................10

CreAgri, Inc. v. USANA Health Services, Inc.
474 F.3d 626 (9th Cir. 2007) ..........................................10, 11

Dessert Beauty, Inc. v. Fox
617 F. Supp. 2d 185 (S.D.N.Y. 2007).....................................18

Estate of Bonilla v. City of York, Pa.
695 F. App'x 643 (3d Cir. 2017) ...........................................22

F.D.I.C. v. Fidelity & Deposit Co. of Maryland
45 F.3d 969 (5th Cir.1995) ...................................................15

Farace v. Independent Fire Insurance Co.
699 F.2d 204 (5th Cir.1983) .................................................15

Gray v. Daffy Dan's Bargaintown
3 USPQ2d 1306 (Fed. Cir. 1987)..........................................10

Guldseth v. Fam. Med. Assocs. LLC
45 F.4th 526 (1st Cir. 2022)..................................................22

In re Brown
    119 USPQ2d 1350 (TTAB 2016) ........................................................................ 10

In re JJ206, LLC
    120 USPQ2d 1568 (TTAB 2016) ........................................................................ 10

In re PharmaCann, LLC
    123 USPQ2d 1122 (TTAB 2017) ........................................................................ 10

Jakobiec v. Merrill Lynch Life Ins. Co.
    711 F.3d 217 (1st Cir. 2013) .............................................................................. 22

Louis Vuitton Malletier S.A. v. Haute Diggity Dog
    507 F.3d 252 (4th Cir.2007) .............................................................................. 25

Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.

    658 F.3d 936 (9th Cir. 2011) ............................................................................. 19

Mitchell v. United States
    526 U.S. 314 (1999) ........................................................................................... 15

Moseley v. V. Secret Catalogue, Inc.
    537 U.S. 418 (2003) ........................................................................................... 25

NNG, KFT. v. AVA Enterprises, Inc., No. 2:14-cv-00220, 2015 WL
    5442725 (C.D. Cal. July 8, 2015) ..................................................................... 20

Oscar Renda Contr. v. City of Lubbock
    No. 5:05-CV-029-C, 2008 WL 11429735 (N.D. Tex. Apr. 18, 2008) .................... 22

Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.
    324 U.S. 806 (1945) ........................................................................................... 18

Redmond v. Brzozowski
    No. SA-96-CA-342-RBO, 1998 WL 36042962 (W.D. Tex. Mar. 11,
    1998) .................................................................................................................. 22

S. California Darts Ass'n v. Zaffina
    762 F.3d 921 (9th Cir. 2014) ....................................................................... 10, 11

State of Idaho Potato Com'n v. G.T. Terminal Packaging, Inc., 425 F.3d 708
    (9th Cir. 2005) ................................................................................................... 19

Thane Intern., Inc. v. Trek Bicycle Corp.
    305 F.3d 894 (9th Cir.2002) .............................................................................. 25

United Phosphorus, Ltd. v. Midland Fumigant, Inc.
    205 F.3d 1219 (10th Cir. 2000) .................................................................... 10, 11

Universal Mfg. Co. v. Douglas Press, Inc.
    1992 WL 106822 (N.D. Ill. May 15, 1992) ....................................................... 18

Weaver v. Champion Petfoods USA Inc.
  3 F.4th 927 (7th Cir. 2021) ........................................................................22

## STATUTES

15 U.S.C. §1051 ...................................................................................9, 10

15 U.S.C. §1116 ........................................................................................18

Fed.R.Civ.P 45............................................................................................6, 9

Fed.R.Civ.P. 56............................................................................................8, 21

Texas Health & Safety Code §481.133 ...................................................11, 18

## OTHER AUTHORITIES

6 McCarthy on Trademarks and Unfair Competition § 31:58.50 (5th ed.)......................9

H.R.Rep. No. 104–374 (1995)..........................................................................24

McCarthy on Trademarks and Unfair Competition §25:15 ...........................18

S.Rep. No. 100–515 (1988).............................................................................24

Senate-House Joint Explanatory Statement on Trademark Counterfeiting
  Legislation, 130 Cong.Rec. H12076, H12078 (Oct. 10, 1984) ................19

The Rational Basis for Trademark Protection, 40 HARV. L.REV. 813 (1927) ............23

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Defendant URZ Trendz, LLC ("Defendant") hereby submits this motion for summary judgment ("Motion") seeking this Court to summarily dismiss the claims filed by Defendant Spectrum Laboratories, LLC ("Plaintiff"). Concurrent with this motion, Defendant hereby submits the declaration of Louis F. Teran ("Teran Decl").

## I. <u>INTRODUCTION</u>

This case arises from Plaintiff's allegations of trademark infringement and counterfeiting first asserted against Royal Fragrances, LLC ("Royal Fragrances") and other parties NOT including Defendant. See *Complaint,* ECF No. 1. Royal Fragrances was subsequently dismissed after it provided Plaintiff a sworn affidavit identifying its suppliers of counterfeiting products. See *Teran Decl.,* Ex. C, ¶9 [R:7]. In fact, Defendant was NOT one of the suppliers identified by Royal Fragrances. See *Id*. Nevertheless, Plaintiff targeted Defendant, one of its competitors, with a third-party subpoena seeking a variety of documents unrelated to any of the claims asserted against Royal Fragrances or any of the other named defendants. Instead, Plaintiff sought highly confidential financial records regarding Defendant's business operation. Thus, Defendant properly responded with objections pursuant Fed.R.Civ.P 45 and Plaintiff subsequently filed a motion to compel. However, without allowing Defendant the opportunity to respond to Plaintiff's motion to compel, this Court granted Plaintiff's motion, identified Defendant as uncooperative, and issued an improper discovery order against Defendant. Then, Plaintiff added Defendant as a party to this case and this Court immediately issued another improper discovery order against Defendant ordering Defendant to begin producing discovery within a mere seven (7) days from being served with the summons and complaint. In fact, prior to adding Defendant to this action, Plaintiff knew that Defendant had not supplied any counterfeiting or infringing product to Royal Fragrances. Furthermore, prior to adding Defendant to this action, Plaintiff conducted a secret purchase of 112 pieces of the accused product from Defendant through a private investigator and, to date, Plaintiff has not made even an allegation that any of those pieces are counterfeits or infringing.

Plaintiff's claims are based on U.S. Trademark Registration Nos. 4453892 and 5791421 for the marks "Quick Fix" and the "Q-Clock" design mark ("the '892 Registration" and "the '421 Registration" and collectively "Registrations"). See *Teran Decl.*, Ex. A [R:2] and Ex. B [R:4]. These Registrations were issued for the following products:

> "synthetic urine for use in urinalyses; dietary supplemental drinks; and chemical compositions and agents for detoxifying medical and clinical urine samples." See *Id*.

Essentially, Plaintiff represented to the USPTO that it sells dietary supplemental drinks and synthetic urine for use in a medical or clinical setting. But, in reality, Plaintiff's trademarks are used in connection with fake urine or fake pee designed to falsify drug tests.

As such, Defendant hereby submits this Motion asserting that Plaintiff's Registrations are invalid. But, if the Registrations are valid, there is no evidence that Defendant is liable for trademark infringement, counterfeiting, or dilution.

## II. <u>SUMMARY OF THE ARGUMENT</u>

Defendant's first and second counterclaims seek the invalidity of Plaintiff's Registrations. See *ECF No. 64*. Now, with this Motion, Defendant respectfully requests this Court to summarily find that Plaintiff's Registrations are invalid due to unlawful use. More specifically, Defendant argues that Plaintiff used its Registrations in connection with products that are illegal or designed to commit fraud. After all, Plaintiff's synthetic urine is designed and used in the marketplace to falsify drug test results. Such unlawful use of Plaintiff's Registrations is sufficient ground to invalidate said Registrations.

In the alternative, Defendant asserted a seventh affirmative defense for unclean hands. See *ECF No. 64*. Now, with this Motion, Defendant respectfully requests this Court to summarily close its doors to Plaintiff's claims due to its sale of illegal products. More specifically, Plaintiff's business enterprise of selling synthetic urine to promote the falsification of drug test results is illegal under Texas law. Thus, this Court should close its doors to Plaintiff so as not to endorse or ratify Plaintiff's illegal business enterprise.

Furthermore, with this Motion, Defendant respectfully requests this Court to summarily dismiss Plaintiff's third cause of action for federal trademark counterfeiting. After all, Plaintiff does not present any evidence nor allege that Defendant used the same registered marks in connection with the same registered goods as identified in Plaintiff's Registrations. Thus, Plaintiff's counterfeiting claim cannot stand as a matter of law.

Even more, with this Motion, Defendant respectfully requests this Court to summarily dismiss Plaintiff's first and second causes of action related to federal trademark infringement. Defendant makes sufficient showing of the absence of evidence that Defendant has infringed any of Defendant's trademarks. In fact, after a secret purchase by Plaintiff's private investigator, an affidavit of an admitted infringer, and after sufficient discovery, Plaintiff is unable to provide even a shred of evidence to support its claim of trademark infringement.

Finally, with this Motion, Defendant respectfully requests this Court to summarily dismiss Plaintiff's fourth cause of action for trademark dilution. Plaintiff has failed to present any evidence that its trademarks have achieved the high degree of fame that is required for a trademark dilution claim. In fact, based on Plaintiff's miniscule advertising expenses, it is unreasonable to suggest that Plaintiff's trademarks for synthetic urine have become household names.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment on "each claim or defense – or the part of each claim or defense – on which summary judgment is sought". See *Fed.R.Civ.P. 56(a)*. Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See *Id.* See also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense (see *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-60 (1970)), or (2) showing that there is an absence of evidence to support the nonmoving

party's case (see *Celotex Corp.,* 477 U.S. at 325). Once this burden is met, the party resisting the motion must set forth "specific facts showing that there is a genuine issue for trial". See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." See *Anderson,* 477 U.S. at 252.

## IV. PLAINTIFF'S REGISTRATIONS ARE INVALID FOR UNLAWFUL USE

Under Section 1(a) of the Lanham Act (15 U.S.C. §1051), a trademark may not be registered unless it is "used in commerce". Section 45 of the Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." In addition, "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." See *Id.* "A valid [trademark] application cannot be filed at all for registration of a mark without 'lawful use in commerce…'" See *Gray v. Daffy Dan's Bargaintown*, 3 USPQ2d 1306, 1308 (Fed. Cir. 1987). The Trademark Trial and Appeal Board ("TTAB") has "consistently held that, to qualify for a federal…registration, the use of a mark in commerce must be 'lawful'." See *In re PharmaCann, LLC,* 123 USPQ2d 1122, 1123-24 (TTAB 2017) (quoting *In re JJ206, LLC,* 120 USPQ2d 1568, 1569 (TTAB 2016) and *In re Brown*, 119 USPQ2d 1350, 1351 (TTAB 2016) (affirming unlawful use refusals to register marks for marijuana-related products or services)). See also *Coahoma Chem. Co., Inc. v. Smith*, 113 USPQ 413, 418 (Comm'r Pat. 1957), affirmed on other grounds, 121 USPQ 215 (CCPA 1959) ("[U]se of a mark in connection with unlawful shipments in interstate commerce is not use of a mark in commerce which the Patent and Trademark Office may recognize.").

In fact, several districts have recognized unlawful use as a defense to an infringement action. See *S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014) (quoting *CreAgri, Inc. v. USANA Health Services, Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) and citing *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000)) ("[O]nly lawful use in commerce can give rise to trademark priority."). See also *6 McCarthy on Trademarks and Unfair Competition* § 31:58.50 (5th ed.). Courts

have found that a trademark can't be used with goods that are illegal. See *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 689 (9th Cir. 2022) ("This rule prevents the absurd result of the government 'extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws.' And it favors sellers who take the time to comply with government regulation before bringing products to market.")

Thus, for a mark to be eligible for federal registration, "any goods…for which the mark is used must not be illegal under federal law." See *PharmaCann*, 123 USPQ2d at 1124 (quoting *JJ206*, 120 USPQ2d at 1569 and *Brown*, 119 USPQ2d at 1351). After all, courts have "held that only lawful use in commerce can give rise to trademark priority". See *S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014). See also *United Phosphorus, Ltd. v. Midland Fumigant, Inc*., 205 F.3d 1219, 1225 (10th Cir. 2000). See also *In Re Morgan Brown*, 119 U.S.P.Q.2d 1350 (T.T.A.B. July 14, 2016) ("We have consistently held that, to qualify for a federal service mark registration, the use of a mark in commerce must be lawful."). Thus, where a trademark's use in commerce is not lawful, the mark may be canceled. See, e.g., *CreAgri, Inc. v. USANA Health Scis., Inc*., 474 F.3d 626, 634 (9th Cir. 2007) (cancelation of trademark was proper where product was mislabeled in violation of federal requirements).

In the present case, as discussed in detail below, Plaintiff's use of its trademarks is in connection with the sale or offer for sale of illegal fake pee to promote the falsification of drug test results. Such use does not meet the "use in commerce" requirement of Section 1(a) of the Lanham Act (15 U.S.C. §1051). In other words, Plaintiff's failure to "use [its trademark] in commerce" as required by the Lanham Act, invalidates the Registration in full as a matter of law. In fact, the '892 Registration was issued for use in connection with "synthetic urine" for medical purposes. But in reality, Plaintiff's "synthetic urine" is advertised and sold as products to falsify drug test results. After all, Plaintiff's "synthetic urine" is advertised in the marketplace as follows:

> "What is synthetic urine? - Synthetic urine, also known as fake urine or fake pee, resembles the chemical structure and physical properties of real human urine…

> **Fake pee is mostly used to pass urine tests** that a person, prank, or sports event organizer can order. In most of these cases, getting caught with traces of toxins in the body can have far-reaching consequences. Instead of facing problems, many people opt to use Quick Fix Synthetic Urine or the larger 3oz Quick Fix Synthetic Urine 6.3 plus bottle.
>
> Submitting fake pee instead of human urine is widely considered to be one of the most effective ways to pass urine tests that you would otherwise fail.
>
> If you recently consumed toxic substances, such as nicotine, Quick Fix is the best synthetic urine kit to help you pass. It is indistinguishable from human urine, even at a molecular level." See *Teran Decl.,* Ex. I [R:38].

Even more, Plaintiff also uses its Registrations in connection with a "Belt Kit" that allows the fake urine to be hidden around the waist underneath clothing so that it appears that a consumer is actually urinating into a cup during a drug test. See *Teran Decl.,* Ex. G [R:28]. But when the "Belt Kit" does not work, Plaintiff sells a specially designed underwear with a hidden pocket into which the fake urine can be hidden. See *Teran Decl.,* Ex. H [R:32].

The overwhelming evidence shows that Plaintiff is in the business of manufacturing and selling substances and devices designed to falsify drug test results. Such is a blatant violation of Texas Health & Safety Code §481.133 which makes the sale of synthetic urine to falsify drug tests punishable by imprisonment as a Class A misdemeanor. After all, Plaintiff's "synthetic urine" is further advertised as follows:

> "Best Synthetic Urine Brand – In this day and age, synthetic products are in demand. Despite efforts by law enforcement and governments to shut down the use of synthetic urine, there is pushback by the consumer, and the consumers are sending a clear message: 'we want it, and we need it'." See *Teran Decl.,* Ex. J [R:42].

In fact, there is an abundance of websites in the internet that provide detailed product reviews of Plaintiff's "synthetic urine". Such websites expressly describe Plaintiff's product as follows:

"Drug abuses have become alarming throughout the world. This menace causes many workplace hassles such as absenteeism, irregularity, accidents, wrong working and loss of reputation. In order to stay clear of all these, job seekers and employees have to pass drug tests. In such situations Quick Fix Synthetic Urine comes into play. ***Quick Fix Synthetic Urine is nothing but a fake pee used by the candidates to deceive the lab tests***. Quick Fix Synthetic Urine is made using real clean human pee and makes it resemble a real human urine from all aspects such as appearance, color, ingredients, specific gravity and ph values." See *Teran Decl.,* Ex. K [R:47].

"***What makes the product the best synthetic urine of 2023 for passing a drug urine test is its exact specifications***. It is unisex and it gets ready quickly. You'd need some chemistry experience to use fake pee from other brands. However, Quick Fix synthetic urine comes in a premixed form. The product works differently compared to powdered or dehydrated urine.
…
Though useful, ***Quick Fix synthetic urine is meant for a five-panel basic urine test*** that doesn't take place under supervision or strict monitoring. You can use this fake pee to pass a drug urine test only if you get an opportunity to pour it at the time of sample collection. It is not meant for tests in which you are required to give your sample by peeing under the observation of a supervisor. With that being said, the best part is that around 95% of pre-employment tests are unsupervised. Therefore, you are likely to find Quick Fix synthetic urine useful for the majority of pre-employment tests." See *Teran Decl.,* Ex. L [R:57-58].

Thus, there can be little doubt that Plaintiff's "synthetic urine" is intended to be used and is used by consumers unlawfully to falsify drug tests. In fact, the U.S. Government's Department of Defense Drug Reduction and Deterrence Program has specifically identified Plaintiff's synthetic urine as a sophisticated fake pee that can falsify the most advanced drug tests. See *Teran Decl.,* Ex. Q [R:74].

A. **Plaintiff's Illegal Use Is Inferred Since Plaintiff Asserted it's 5th Amendment Rights Before The U.S. Congress**

Any doubt of the illegality of Plaintiff's synthetic urine product is dispelled by its testimony before the U.S. Congress when legislation regarding synthetic urine products was being evaluated. In fact, Plaintiff's founder and owner, Mr. Matt Stephens, was called

to testify before Congress regarding Plaintiff's sale of synthetic urine to falsify drug test results. But, Mr. Stephens, refused to testify and invoked the Fifth Amendment based on his reasonable fear that providing truthful testimony might incriminate him in a future criminal proceeding. In fact, the relevant sections of the Congressional record are as follows:

> "We know that over the past decade, a quickly expanding industry has evolved around products that help illicit drug users subvert drug tests. A myriad of companies currently sell dozens of products that are designed to mask the presence of illegal drugs in users' urine, hair, blood, and saliva. These products are ubiquitous and are sold primarily over the Internet, in 'head shops', and even in health food stores. Additionally, there are products that deliver substitute ·· clean or drug-free urine warmed to body temperature. They have catchy names such as the ··urinator and the ··whizzinator. These products have even been in the news. Just last week, we learned about an NFL player caught with a Whizzinator. We will see print ads and Internet ads that blatantly advertise and guarantee that when used according to instructions, ··You Will Pass Your Drug Test or Double Your Money Back! The Committee has obtained some information on the finances and operations of a couple of companies, a sub-sample of this mysterious industry. What we have learned is that the bottom lines of these companies is consistent with a trend of an industry that is growing and making millions of dollars. However, we don't know the overall size of this industry. At today's hearing, we will have an opportunity to gain some insight from three witnesses in this industry who will appear before the Subcommittee." See *Teran Decl.,* Ex. S [R:89].

Thus, the congressional hearing was to allow Congress to understand the extent and scope of the industry involving fake pee and other products used to falsify drug test results. Not surprisingly, Congress identified and subpoenaed Plaintiff as a manufacturer of these fake pee products. At the hearing, Plaintiff's representative, Mr. Stephens, refused to testify and asserted protection from the 5th Amendment as follows:

> "Mr. Whitfield: At this time we will call…Mr. Matt Stephens… Matt Stephens is the owner of Spectrum Laboratories…
> …
> Mr. Whitfield: My next question is for Mr. Stephens. What is the intended use of your company's products and does your company market these products for the purpose of subverting lawful drug testing programs?
> Mr. Stephens: Under the advice of counsel, I respectfully decline to comment on that question.

Mr. Whitfield:  So you are refusing to answer the question on the basis of the protections afforded to you under the fifth amendment of the Constitution?
Mr. Stephens:  That is correct.
Mr . Whitfield:  Do you intend to invoke the fifth amendment right in response to any questions we may ask you today?
Mr. Stephens:  That is also correct.
Mr. Whitfield:  You are excused from the witness table at this time, but I advise you that you remain subject to the process of the committee and that if the committee's needs are such, then we may recall you at some future time."  See *Teran Decl.,* Ex. S [R:147-149].

Then, after pleading the 5th Amendment, Plaintiff ran to the PTO with false representation that its products are for scientific, medical, and dietetic purposes.  There is nothing more disingenuous!

Nevertheless, Mr. Stephen's invocation of the 5th Amendment is admissible in this case because it is directly relevant to the issue of whether Plaintiff sells illegal products.  See *F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir.1995).  Even more, Mr. Stephen's invocation of the 5th Amendment and refusal to answer as to Plaintiff's intended use of its "synthetic urine", serves to establish an adverse inference that the answer would have been against Plaintiff's interests.  See *Mitchell v. United States*, 526 U.S. 314 (1999).  See also *Baxter v. Palmigiano*, 425 U.S. 308 (1976).  See also *Farace v. Independent Fire Insurance Co.*, 699 F.2d 204, 210 (5th Cir.1983).  Essentially, Mr. Stephen's testimony to Congress serves as admissible evidence to infer that Plaintiff's "synthetic urine" is not intended for medical use as Plaintiff represented to the PTO.  Instead, Plaintiff's "synthetic urine" and other products are intended for use illegally to falsify drug test results.

**B.** **Plaintiff Failed to Provide Evidence of Legal Use**

During discovery, Plaintiff was requested to explain the intended use and likely use of its "synthetic urine" product.  See *Teran Decl.,* Ex. E, Interrogatory Nos. 3 and 4 [R:17]].  In response, Plaintiff produced copies of its website located at www.urineluck.com.  See *Teran Decl.,* Ex. F [R:24-25].  On its website, Plaintiff has a disingenuous disclaimer that states as follows:

14

"Quick Fix synthetic urine is significant to the scientific community. It is perfect for any laboratory needing to calibrate drug testing equipment. Quick Fix is also a perfect control sample for instant drug test kits. With Quick Fix, you can have peace of mind knowing you have a reliable, high-quality solution." See *Teran Decl.,* Ex. F [R:25].

Thus, Plaintiff's website indicates that its "synthetic urine" product is for use in laboratory setting by the scientific community. But, on the same website advertisement, Plaintiff advertises its "synthetic urine" product as follows:

"So, how do people travel with their synthetic urine? Spectrum Labs has recently developed a Leg Strap and Ankle Strap designed for our bottles and hand warmers. This allows users to comfortably carry their Quick Fix under their pantlegs with total discretion!" See *Teran Decl.,* Ex. F [R:24].

Thus, on the one hand, Plaintiff asserts that its synthetic urine is intended for use by scientists in a laboratory setting. But on the other hand, Plaintiff promotes its "Leg Strap" and "Ankle Strap" designed for a person to carry the synthetic urine "under their pantlegs". This begs the question, what scientist working in a laboratory setting would ever be in need to carry synthetic urine discretely hidden under his/her pantlegs with a leg or ankle strap? Clearly, Plaintiff's disclaimer about laboratory use is a sham. This is similar to Plaintiff's false representation to the PTO that its synthetic urine is for medical use.

Nevertheless, while Plaintiff was quick to produce copies of its website in which it advertises its synthetic urine for use in laboratory setting, Plaintiff audaciously withheld the advertisements it published on its social media accounts. In fact, on its social media accounts, Plaintiff advertised its synthetic urine product as follows:

"Dodging the Nicotine Test with a Twist! Got a surprise nicotine test headed your way? Fear not, fellow rebels! Introducing Fake Urine - your secret weapon against the tobacco police. Say goodbye to stressing over screenings! With Fake Urine, you're in control. Just a little switcheroo and you're on your way to a clean slate. There is no judgment here, just empowerment!" See *Teran Decl.,* Ex. M [R:64].

"Spectrum Labs will remain in operation while the COVID-19 crisis is underway. We have warehouses in multiple states, including fulfillment centers that have been deemed essential by the state government. We will continue to ship the world's best synthetic urine to those that need to pass pre-employment nicotine tests." See *Teran Decl.,* Ex. N [R:66].

"More schools and employers are conducting random nicotine tests than ever before. Protect your privacy with Quick Fix!"  See *Teran Decl.,* Ex. O [R:68].



See *Teran Decl.,* Ex. P [R:70].

In fact, Plaintiff's social media page expressly states as follows:

"At Spectrum Labs our motto is 'Don't Let Your Job Go Up In Smoke.'  Our detox products will help you."  See *Teran Decl.,* Ex. M-P.

Thus, Plaintiff's false representation that it sells synthetic urine to the scientific community cannot fool any reasonable prudent trier of fact.  Especially when Plaintiff's synthetic urine is packaged with hand warmers and a heat pack as advertised in Plaintiff's website along with leg straps and ankle straps to discretely carry it under pantlegs.  See *Teran Decl.,* Ex. F [R:22-25].  After all, the U.S. Government's Department of Defense Drug Reduction and Deterrence Program has identified Plaintiff's synthetic urine as a sophisticated fake pee that can falsify the most advanced drug tests.  See *Teran Decl.,* Ex. Q [R:74].

Accordingly, the overwhelming evidence shows that Plaintiff's use of its trademarks is unlawful.  As such, Plaintiff's Registrations must be invalidated.

**C.**    **In the Alternative, the Court Must Stay This Case Pending Resolution of Cancellation Proceeding Filed With the PTO**

If this Court decides not to invalidate Plaintiff's Registrations for unlawful use or decides to uphold the PTO's issuance of the Registrations to Plaintiff, then Defendant respectfully requests this Court to stay this matter until the PTO resolves a cancellation

proceeding that has been filed with the PTO.  In fact, Defendant has filed a Cancellation Proceeding with the Trademark Trial and Appeal Board ("TTAB") of the PTO seeking the cancellation of Plaintiff's Registrations for unlawful use and fraud on the PTO.  Since the validity of Plaintiff's Registrations and whether the PTO properly issued the Registrations to Plaintiff are material issues in this case, it would be proper for this Court to stay this action until the TTAB resolves the cancellation proceeding, if this Court is unwilling to invalidate the Registrations.

## V.  PLAINTIFF'S CLAIMS MUST BE DISMISSED DUE TO UNCLEAN HANDS

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  See *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co*., 324 U.S. 806, 814 (1945).  Although equity does not demand that the parties "have led blameless lives ... it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue."  See *Id*. at 814–15.  For the doctrine to apply, a party's conduct does not need to be one punishable as a crime or one that would justify legal proceedings of any sort.  See *Id.* at 815.  "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause" for the court to invoke the doctrine.  See *Id.*  In fact, several district courts have held that the unlawful use defense against trademark infringement "has its origins in the common law doctrine of unclean hands," and serves as a "way of preventing the government from having to extend the benefits of trademark protection to a seller who violates laws."  See *Dessert Beauty, Inc. v. Fox*, 617 F. Supp. 2d 185, 190-91 (S.D.N.Y. 2007).  See also *Universal Mfg. Co. v. Douglas Press, Inc*., 1992 WL 106822, at *2 (N.D. Ill. May 15, 1992) ("[C]ourts have barred plaintiffs from asserting their trademark rights where plaintiff's uses of their trademarks, as opposed to their conduct in obtaining them, were illegal.").

In the present case, as discussed above, Plaintiff has filed this lawsuit to protect its criminal enterprise of selling synthetic urine to drug addicts who need it to falsely pass urine

tests that are routinely conducted by employers, law enforcement, and government agencies to test for illegal drug use. Plaintiff's entire business operation is unclean and in direct violation of Texas Health & Safety Code §481.133. In other words, Plaintiff promotes fraudulent activity and directly profits from selling products that allow its customers to defraud their employers, law enforcement, and government agencies. Now with this lawsuit, Plaintiff seeks to protect its unclean business operation, more specifically, Plaintiff seeks this Court to ratify Plaintiff's use its trademarks with illegal products. A ruling by this Court favorable to Plaintiff would essentially endorse Plaintiff's illegal activities.

Accordingly, it is important that this Court close its doors to Plaintiff's illegal activities and dismiss all its claims asserted in this action.

## VI.    THE COUNTERFEITING CLAIM MUST BE SUMMARILY DISMISSED

Plaintiff asserts a claim of counterfeiting against Defendant. See *Third Amended Complaint,* ECF No. 62, p.13-15. More specifically, Plaintiff alleges that Defendant used a "counterfeit mark" without Plaintiff's authorization. See *Id.* The term "counterfeit mark" is defined in 15 U.S.C. §1116(d)(1)(B)(i) as follows:

> "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use…"

Essentially, a counterfeiting claim can stand if and only if Defendant used the same registered mark in connection with the same registered goods as it appears in the Registrations. In fact, one circuit court has held as follows:

> "In this context, the mark used by [the defendant] was counterfeit if: (1) it was a non-genuine mark identical to [the plaintiff's] mark; (2) *[the plaintiff's] mark was registered on the Principal Register for use on the same goods to which [the defendant] applied the mark*; (3) [the plaintiff's] mark was in use; and (4) [the defendant] was not authorized to use [the plaintiff's] mark." See *State of Idaho Potato Com'n v. G.T. Terminal Packaging, Inc.,* 425 F.3d 708, 721 (9th Cir. 2005) (citing *McCarthy on Trademarks and Unfair Competition §25:15* and referencing *15 U.S.C. §§1116(d)(1)(B)(i)*). Emphasis Added.

Another circuit court has similarly held as follows:

> "Section 1116(d) requires that the mark in question be (1) a non-genuine mark identical to the registered, genuine mark of another, where (2) ***the genuine mark was registered for use on the same goods to which the infringer applied the mark*.**"  See *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,* 658 F.3d 936, 946 (9th Cir. 2011).  Emphasis added.

Additionally, at least two (2) district courts held in the same manner.  See *Coach, Inc. v. Asia Pac. Trading Co.,* 676 F.Supp.2d 914, 923-24 (C.D. Cal. 2009) (rejecting counterfeiting where the plaintiff's mark was registered for use on "sunglass cases" but the counterfeited marks were affixed to "sunglasses").  See also *NNG, KFT. v. AVA Enterprises, Inc.,* No. 2:14-cv-00220, 2015 WL 5442725, at *6 (C.D. Cal. July 8, 2015) (rejecting counterfeiting where the plaintiff's mark was registered for use on "computer programs and software" but the counterfeited marks were affixed to "automotive audio and entertainment products").

Even more, in a Joint Statement on Trademark Counterfeiting Legislation ("Joint Statement"), Congress explained the definition of "counterfeit mark" as follows:

> "The definition of 'counterfeit mark' in this Act reaches only instances in which the mark is used in connection with goods or services for which the mark is registered on the principal register of the U.S. Patent and Trademark Office and in use…  In addition, because this act is intended to reach only the most egregious forms of trademark infringement, it does not affect cases in which the defendant uses a registered mark in connection with goods and services for which the mark is not registered.  Under the Lanham Act, a plaintiff can sometimes obtain relief against a defendant who uses a mark in connection with goods or services that are 'related' to those for which the mark is registered.  For example, a plaintiff with a federal registration for use of the mark 'Hopscotch' on typewriters might have a Lanham Act remedy against a defendant who used that mark to identify typing paper, even though the plaintiff had not registered that mark for use in connection with typing paper.  Under the present act, however, the use of the mark 'Hopscotch' on typing paper would not count as the use of a 'counterfeit mark'."  See *Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation,* 130 Cong.Rec. H12076, H12078 (Oct. 10, 1984).  See *Teran Decl.,* Ex. R [R:81].

Thus, Congress, circuit courts, and district courts have made clear that counterfeiting applies only when the mark is registered for use on the same goods in which the infringer applied the mark.

In the present case, the '421 Registration expressly identifies the following registered goods: "Dietary supplemental drinks; chemical compositions and agents for detoxifying medical and clinical urine samples, namely, chemical reagents for medical purposes" and "Untreated multi-drug testing dip cards for drug use testing purposes". See *Teran Decl.,* Ex. B [R:4].

However, in the Third Amended Complaint, Plaintiff does not even allege that Defendant sold any dietary drinks, chemical reagents, or testing dip cards. Instead, Plaintiff merely alleges that Defendant used the marks in connection with "the Counterfeit Product". See *Third Amended Complaint,* ECF No. 62, ¶57. Then, Plaintiff defines the term "Counterfeit Product" as follows:

> "The Counterfeit Product duplicates the Quick Fix Mark, Q-Clock Mark and the Quick Fix trade dress and contains synthetic urine, a heater pad, plastic bottle, and an instructions pamphlet with language verbatim to that contained in the Quick Fix product." See *Third Amended Complaint,* ECF No. 62, ¶16.

Thus, Plaintiff merely alleges that Defendant illegally sold the "synthetic urine" product. Plaintiff does not even allege that Defendant ever sold any dietary drinks, chemical compositions, or testing dip cards. As such, there is no allegation that Defendant sold or offered to sell any of the registered goods identified in the '421 Registration. Accordingly, Plaintiff's counterfeiting claim regarding the '421 Registration must be summarily dismissed.

Similarly, the '892 Registration expressly identifies the following registered good: "Chemical compositions and agents, namely, synthetic urine for use in urinalysis". See *Teran Decl.,* Ex. A [R:2].

However, the Third Amended Complaint does not even allege that Defendant sells any "synthetic urine for use in urinalysis".  Plaintiff merely alleges that Defendant sells "synthetic urine" but does not allege that such "synthetic urine" is specifically "for use in urinalysis".  As such, there is no allegation that Defendant sold or offered to sell the registered good identified in the '892 Registration.  Accordingly, Plaintiff's counterfeiting claim regarding the '892 Registration must be summarily dismissed.

## VII.  THE TRADEMARK INFRINGEMENT CLAIM MUST BE DISMISSED FOR LACK OF EVIDENCE

Where, as here, the nonmoving party bears the burden of proof at trial, Fed.R.Civ.P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  See *Id*. at 322–23.

After all, it is well settled that summary judgment is the "put up or shut up" moment in litigation.  See *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 533 (1st Cir. 2022) (quoting *Jakobiec v. Merrill Lynch Life Ins. Co*., 711 F.3d 217, 226 (1st Cir. 2013) (noting that "summary judgment is the put up or shut up moment in litigation'"").  See also *Weaver v. Champion Petfoods USA Inc*., 3 F.4th 927, 938 (7th Cir. 2021) (quoting *Beardsall v. CVS Pharmacy, Inc*., 953 F.3d 969, 972 (7th Cir. 2020) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").  See also *Estate of Bonilla v. City of York, Pa*., 695 F. App'x 643, 648 (3d Cir. 2017) (quoting *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)) ("[S]ummary judgment is essentially

'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). See also *Oscar Renda Contr. v. City of Lubbock*, No. 5:05-CV-029-C, 2008 WL 11429735, at *15 (N.D. Tex. Apr. 18, 2008) (quoting *Berckleley*, 455 F.3d at 201). See also *Redmond v. Brzozowski*, No. SA-96-CA-342-RBO, 1998 WL 36042962, at *27 (W.D. Tex. Mar. 11, 1998).

In the present case, on May 4, 2023, before Plaintiff filed this action against Defendant, Plaintiff made a secret purchase of 112 pieces of the accused product from Defendant through a private investigator. See *Teran Decl.,* Ex. D [R:11]. But, to this date, Defendant has NOT made even an allegation that any of the pieces that Plaintiff's private investigator purchased from Defendant are counterfeits or infringing Plaintiff's trademarks. See *Teran Decl*., Ex. E, Interrogatories Nos. 19-23 [R:19-20]. In fact, during discovery, Defendant propounded the following interrogatories to Plaintiff:

> "INTERROGATORY NO. 19: Identify any and all third parties that provided YOU with any information RELATED TO the infringement/counterfeiting or potential infringement/counterfeiting of any of the TRADEMARKS by [Defendant].
>
> INTERROGATORY NO. 20: For each third party identified in response to Interrogatory No. 19, explain in detail what information was given to YOU.
>
> INTERROGATORY NO. 23: Explain in detail, any and all evidence that YOU had as of August 30, 2023, RELATED TO PROPOUNDING PARTY's infringement/counterfeiting of any of the TRADEMARKS." See *Teran Decl.,* Ex. E [R:19-20].

In response to these interrogatories, Plaintiff referred to the following response:

> "As stated in Spectrum's Complaint, URZ and its attorney's evasive response to Spectrum's Subpoena (including denying sale of Quick Fix), and URZ's ongoing refusal to produce complete sales information for Quick Fix sales and purchases provides Spectrum with more than enough information to believe that URZ is an active and willful participant in the counterfeiting of Quick Fix. Additionally, URZ's defense in this action that it is legally allowed to counterfeit Quick Fix because it is allegedly an 'unlawful' product further evidences that URZ is counterfeiting or selling counterfeit Quick Fix." See *Teran Decl.,* Ex. E [R:19-20].

Essentially, Defendant's only sin here was to assert its rights by properly objecting to Defendant's overbroad subpoena pursuant Fed.R.Civ.P. 45. There is not even an allegation that any of the pieces that Defendant's private investigator purchased from Defendant in May 2023, were counterfeits or infringing any trademark.

Even more, Royal Fragrances, the original defendant in this case, did not point the finger at Defendant being a counterfeiter. See *Teran Decl*., Ex. C, ⁋9 [R:7]. In fact, Royal Fragrances provided Plaintiff a sworn affidavit identifying its suppliers of infringing products and Defendant was NOT one of them. The sworn affidavit of Royal Fragrances unambiguously states as follows:

> "9. As the invoices attached as Exhibit A show, the only business from which [Royal Fragrances] has purchased Quick Fix are: Supreme Imports LLC, Elite Wholesale, and MWI Wholesale. There are no other businesses or individuals from whom [Royal Fragrances] has purchased or received Quick Fix." See *Teran Decl.,* Ex. C, ⁋9 [R:7].

Clearly, there is no evidence whatsoever that Defendant has ever sold or offered for sale any counterfeit or infringing product to Royal Fragrances or to anybody else. Accordingly, Plaintiff's trademark infringement claim must be summarily dismissed.

## VIII.  **THE TRADEMARK DILUTION CLAIM MUST BE DISMISSED BECAUSE PLAINTIFF'S TRADEMARKS ARE NOT FAMOUS**

Plaintiff asserts a claim for trademark dilution based on the allegation that Plaintiff's trademarks are distinctive and famous. See *Third Amended Complaint,* ⁋83. Trademark dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value. See *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir.1999) (citing the seminal trademark article by Frank L. Schechter, *The Rational Basis for Trademark Protection*, 40 HARV. L.REV. 813 (1927), which proposed a cause of action for dilution). Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting "rights in gross" in a trademark. See *Id*. The legislative history shows a similar concern. Congress passed the anti-dilution legislation because it sought to protect unauthorized users of famous marks from those

"attempt[ing] to trade upon the goodwill and established renown of such marks," regardless of whether such use causes a likelihood of confusion about the product's origin. See *H.R.Rep. No. 104–374*, at 3 (1995) reprinted in 1995 U.S.C.C.A.N. 1029, 1030. The legislative history speaks of protecting those marks that have an "aura" and explains that the harm from dilution occurs "when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." See *Id*. See also *S.Rep. No. 100–515*, at 7 (1988). For example, such harm occurs in the hypothetical cases of "DUPONT shoes, BUICK aspirin, and KODAK pianos," according to the legislative history. See *Moseley v. V. Secret Catalogue, Inc*., 537 U.S. 418, 431 (2003) (quoting *H.R.Rep. No. 104–374*, at 3 (1995), as reprinted in 1995 U.S.C.C.A.N. 1029, 1030). This is true even though a consumer would be unlikely to confuse the manufacturer of KODAK film with the hypothetical producer of KODAK pianos. See *Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, 507 F.3d 252, 268 (4th Cir.2007). In short, a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. See *Thane Intern., Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 911 (9th Cir.2002). In other words, the mark must be a household name. See *Id*.

In the present case, it is unreasonable and comical to even suggest that any of Plaintiff's trademarks have achieved sufficient fame to be a household name. After all, Plaintiff uses its trademarks in connection with synthetic urine, certainly not a household product by any stretch of the imagination. In fact, in discovery, Plaintiff responded to Interrogatory No. 12 as follows:

> "INTERROGATORY NO. 12: Identify all channels through which YOU have advertised each and every one of the PRODUCTS.
> RESPONSE: [Plaintiff] advertises its products on its website, word of mouth, trade shows, and Google Ads." See *Teran Decl.,* Ex. E, Interrogatory No. 12 [R:18].

Even more, Defendant propounded the following Interrogatory No. 16:

> "INTERROGATORY NO. 16: List the amount of money YOU spent annually in advertising each of the TRADEMARKS within the last five (5) years." See *Teran Decl.,* Ex. E [R:19].

In response to Interrogatory No 16, Plaintiff provided a document indicating that its annual advertising expenses did not exceed $200,000. See *Teran Decl.,* ¶21. In fact, Plaintiff's advertising expenses for one year was around a measly $10,000. See *Id.* Therefore, it is unreasonable and outright laughable to suggest that Plaintiff's trademarks used in connection with synthetic urine and with an annual advertising expenses under $200,000 would ever attain the type of fame or household name status that is required for a trademark dilution cause of action. It is outright laughable to suggest that the "Quick Fix" mark is famous the likes of DUPONT, BUICK, and KODAK.

As such, Plaintiff's trademark dilution cause of action must be summarily dismissed.

## IX. <u>CONCLUSION</u>

Based on the foregoing, Defendant respectfully requests this Court to grant this motion and summarily dismiss all of Plaintiff's claims in this action.

DATED: March 20, 2024

By:_____

Louis F. Teran (Admitted *Pro Hac Vice)*
Email: lteran@slclg.com
California Bar No. 249494
SLC Law Group
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Phone: 818-484-3217 x200

ATTORNEY FOR URZ TRENDZ, LLC.

## CERTIFICATE OF SERVICE

I certify that I filed this brief via the ECF system, which serves this motion on all counsel of record.

DATED:  March 20, 2024

By:_____

Louis F. Teran (Admitted *Pro Hac Vice*)
Email: lteran@slclg.com
California Bar No. 249494
SLC Law Group
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Phone:  818-484-3217 x200

ATTORNEY FOR URZ TRENDZ, LLC.