# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| SPECTRUM LABORATORIES, LLC | § | CASE NO. 4:22-CV-03705 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | JUNE 18, 2025 |
| URZ TRENDZ, LLC, ET AL | § | 3:40 P.M. TO 4:54 P.M. |

**MOTION HEARING**

BEFORE THE HONORABLE CHARLES ESKRIDGE
UNITED STATES DISTRICT JUDGE

APPEARANCES:                          SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:    APRIL CAVAZOS

COURTROOM CLERK:                  JENNELLE GONZALEZ

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:

FOR THE PLAINTIFF:                     MCDONALD HOPKINS, LLC
                                       David B. Cupar, Esq.
                                       600 Superior Ave. East
                                       Suite 2100
                                       Cleveland, OH 44114
                                       216-348-5400

                                       HICKS THOMAS LLP
                                       David Ryan Cordell, Jr., Esq.
                                       700 Louisiana St., Ste. 2300
                                       Houston, TX 77002
                                       713-547-9130

FOR THE DEFENDANT                      SLC LAW GROUP
URZ TRENDZ, LLC:                       Louis F. Teran, Esq.
                                       1055 East Colorado Ave.
                                       Suite 500
                                       Pasadena, CA 91106
                                       818-484-3217

**HOUSTON, TEXAS; WEDNESDAY, JUNE 18, 2025, 3:40 P.M.**

COURT SECURITY OFFICER: All rise. The United States District Court for the Southern District of Texas is now in session. The Honorable Charles Eskridge residing. God save the United States and God save this Honorable Court.

THE COURT: Thank you, everyone. Please be seated.

All right. I call 22-3705, Spectrum Laboratories, LLC v. -- who's left here -- URZ Trendz, LLC.

Can I get appearance of counsel, please?

MR. CUPAR: Your Honor, Dave Cupar on behalf of Spectrum Laboratories. And with me is my co-counsel, Ryan Cordell.

THE COURT: Okay. Thank you.

MR. TERAN: Good afternoon, Your Honor. Louis Teran on behalf of Defendant URZ, LLC.

THE COURT: All right. Thank you-all. Welcome back, everybody.

All right. So we have for attorney fees and costs and for terminating sanctions. So we have quite a bit to discuss. These are motions that are coming from Plaintiffs.

So I guess, Mr. Cupar, are you going to argue today or is Mr. Cordell?

MR. CUPAR: I will, Your Honor.

bottom, left, right. They had access to all of our records. They reviewed all of our records. They imaged all of our cell phones to look for messages. That was done. We complied with that.

At a certain -- in that order, also, there was an order to provide all the computers, and we made those available in July. But on that very morning of when that was supposed to happen, I emailed Defendant's counsel that everything is a go; everything is working.

THE COURT: And when are we talking? At what point in time are you now?

MR. TERAN: This is in July of --

THE COURT: So this is July before our December hearing.

MR. TERAN: Right.

THE COURT: Okay. So we're still --

MR. TERAN: Correct.

THE COURT: -- back middle of last year.

MR. TERAN: Right.

THE COURT: Okay. Go ahead.

MR. TERAN: So in July, when the Court ordered to produce computers, we did so. And the Court said, produce the computers below -- before, I think it was like July 12th. And we made those computers available, and we provided three dates before July 12th.

They picked one.  On the morning of that date, I emailed Defendant's counsel -- and that's on the record -- "Computers are ready.  They're ready to be inspected. You're welcome to come as planned."

Then there was a storm in Houston, so they couldn't make it.  They canceled for that day.  So we had to reschedule that analysis of the computers to August, the month after.  I think it was exactly a month after because of the storm and various other scheduling issues.

Two days before that new date, that's when the computers went down.  And as soon as I learned about it from my client, I emailed Defendant's counsel.  I indicated computers are inoperable; we don't know why.  But they went anyways, and we allowed them to go in anyways.

They took the computers.  They did their forensic analysis, right.  Then we came back here in December with that information to the Court.  And the Court said, I think upon their request, the Court said, give them the computers again for, I think it was seven days, because that's what they requested.

They said, if we have the computer -- if we had had the computers, if we can have the computers for a longer period of time for an analyst to do a total, you know, complete analysis of the computers, we can probably figure something out.

And so the Court ordered us to do that, and we did. We provided the computers to Defendants for the exact amount of time that the Court ordered us to do so. So that was done. All right.

There was a comment here made by counsel indicating that or alleging that we relaxed the antivirus settings, right. And that is not true. Because when they completed their analysis of the computers, we took those computers.

When they were finished with those computers, we took the computers to our own expert, right, Mr. Naik, Naik, I think, is how you pronounce it. He did his own forensic analysis of the computers.

And what he concluded is that it wasn't a virus; it was a ransomware. The computers were attacked, or that one computer was attacked by ransomware, and it was attacked through some portal that the software that was being used allowed opened up.

The software that they were being -- that they were using for their financial records to record profits and sales and inventory and such apparently opened up a portal --

THE COURT: Okay.

MR. TERAN: -- so that they would have 24-hour access to the data from -- remotely from their phones. And

so by doing that, that one software that they had been using for years apparently opened up some portal, but that portal had been opened for years. And it just so happened that during that time period, a ransomware somehow entered into the computer.

THE COURT: Hold on one second.

MR. TERAN: Yes.

THE COURT: Jennelle, can you print for me docket 142?

It's just one of the orders that you referred to. Go ahead.

MR. TERAN: Yes. I have it in front of me actually. Okay. So that -- but that was complied with. The Court ordered us to provide the computers for a period of, I believe, it was seven days or seven business days, and we did so. That was done.

It is unfortunate that the computers were infected by ransomware. That is not our doing. Now there is another allegation that there was a USB drive, I think counsel indicated, that had been plugged in a week before the ransomware attack. That is a false statement.

That is counsel right now falsely making an allegation. That is a categorically false statement. It is disputed by Defendant's own expert. His own expert identifies the dates of when the ransomware attack occurred

and when this USB drive was somehow connected to those computers.

The USB drive was connected after the ransomware, and that is included in our briefing. That is directly from their expert that made that analysis reviewed by our expert, and our expert pointed that out.

But not only that, but this USB drive that is being alleged is not a physical USB drive, which is why you can't even find it on Google. We provided the Declaration of Mr. Ghafoor who states that he searched for the USB drive that was identified in the Court's order.

He searched for it; it doesn't exist, right. And so he assumed -- that was in his Declaration -- he assumed, he presumed that it was probably a printer because they did have a printer, an HP printer connected to the computer.

And in the specifications of that printer, it indicates that it has a 250-megabyte flash memory. And so, with that he presumed, well, it must have been the computer because we don't have an HP drive. That was his Declaration.

We then provided the information that was provided to us by Defendant's expert. We provided that -- because we don't have access to the computers, the data from the computers was taken by Defendant's expert -- we provided that information to our expert witness.

He analyzed that information thoroughly and he provided a Declaration in which he indicates there are, I think, at least nine identifying elements that show that this USB drive is not a physical USB drive. It is a virtual USB drive. That, Your Honor, is something I didn't know existed, but apparently it does, and it was concurred by Defendant's experts afterwards.

A virtual USB drive apparently is a connection that is created virtually between a software that is being used in the computer so that the makers of the software can remotely update the software periodically when needed.

They have a direct connection to the computer so they can periodically update software. And so for that purpose, software apparently creates these virtual USB ports and which is identified by computers as an actual USB drive.

The computer doesn't know the difference when you look at the inside mechanisms of the computers. And that was explained by our expert witness.

One key note to indicate there is that Defendant's counsel and Defendant's expert said in their brief, we know that there was a USB drive connected to this computer because we have a serial number, and they identified the serial number.

THE COURT: Uh-huh.

MR. TERAN: And then we looked for that serial

number. Because HP, a Hewlett Packard, is a manufacturer that provides a serial number lookup tool.

THE COURT: Uh-huh.

MR. TERAN: We plugged that serial number in and lo and behold, it doesn't exist. It is not linked to any HP product. So that was further evidence to support the notion that this was not an actual USB drive; it is a virtual USB drive.

Even more, this is something -- I think it was pointed out in our expert's Declaration -- the connection of the USB drive has been determined to have taken place around 3:00 a.m. in the morning, right. Nobody's up at 3:00 a.m. in the morning. Certainly not my client or nobody's at their office.

THE COURT: Why does that stand to reason?

MR. TERAN: Well, because that --

THE COURT: I mean, that makes --

MR. TERAN: -- indicates --

THE COURT: -- that, like, makes literally no sense.

MR. TERAN: Well, I'll explain to you.

THE COURT: That somebody that's trying to hide and spoliate evidence might not be doing it at 3:00 a.m.?

MR. TERAN: Well, no, I'll tell you why, Your Honor.

THE COURT: I mean, you know --

MR. TERAN: I'll tell you why that makes sense. Because the software developer, they update their software in the off hours when the software is not being used so as not to interfere with the usage --

THE COURT: Uh-huh.

MR. TERAN: -- of the software. So it is not uncommon for software developers, once they have this virtual USB connection to a computer, to remotely update their software. You know, in the middle of the night.

THE COURT: What about the -- not -- I'll hear from Mr. Cupar on some of those points. On the access to the 14 email accounts?

MR. TERAN: Right. So the access to the 14 --

THE COURT: That hasn't happened, right?

MR. TERAN: That has not happened.

THE COURT: Okay.

MR. TERAN: Right. And here's the reason why. When the Court ordered us to provide access to those email accounts, URZ and all the various people associated with these accounts, they agreed to make it as easy as possible for them to do this. All right?

They did away with any two-factor authentication code requirements. They did away with anything other than a password, username, and password, right. And then they went

ahead and changed the password to be consistent with all the accounts so that it would be very simple --

THE COURT: Uh-huh.

MR. TERAN: -- for Defendant's expert to gain access to the email accounts --

THE COURT: Okay.

MR. TERAN: -- especially with the time constraints that was provided. I think we were only given three or four days for them to download all these email accounts. But something that we did not anticipate occurred. When Defendant's expert -- he did not try to access all of the 14 email accounts. We don't believe this would have happened with all the 14 email accounts.

I think he only tried two or three of them. But when he tried to access two or three of the accounts, there was a request for a two-factor authentication from Google --

THE COURT: Uh-huh.

MR. TERAN: -- not from us. It was directly from Google, right. We were not made --

THE COURT: That's two-factor authentication that's information from those who have the accounts.

MR. TERAN: Well, so what happened --

THE COURT: So they would have to provide that information.

THE COURT: -- so what happened was there was a

screen that popped up and now we have a copy of the screen. And in that screen, it says, Google wants to know that this is actually you trying to access your account.

THE COURT: I know. This is -- I mean, you put this in front of me and purported to instruct me to answer your questions about this. And I believe that I wrote, "As to clarification, the Court is of the firm opinion that its orders are of adequate clarity to permit Defendant and its counsel to proceed in good faith observance of those orders if that is their actual desire. As to reconsideration, no adequate showing has been made as to intervening change of controlling law, new evidence, or a need to correct clear error or prevent manifest injustice. And as to extension, again, nothing prevented Defendant and its counsel from timely compliance if that is their actual desire."

MR. TERAN: This is on the docket 142 order?

THE COURT: This would be 167 because you had made a filing moving for clarification, reconsideration, and extension of time, which was your docket 152. And I think this may have been what Mr. Cupar was replying to.

MR. TERAN: Oh, this is --

THE COURT: Because then I concluded, "If compliance is still outstanding as of the date of this order, a later showing of immediate compliance after entry of this order will be taken into consideration as to any

consequences for failures to date."

MR. TERAN: When was that issued, Your Honor?

THE COURT: May 19th of 2025. And there's still not full compliance --

MR. TERAN: Okay.

THE COURT: -- as far as I can see.

MR. TERAN: So we checked --

THE COURT: I mean, that was -- I was giving you a last chance in December.

MR. TERAN: I understand, Your Honor.

THE COURT: And then that didn't happen. And then I'm giving you a --

MR. TERAN: Well, here's --

THE COURT: -- last, last chance --

MR. TERAN: Right.

THE COURT: -- in May to fully comply, and it's still not compliance. And I'm hearing you make the same arguments to me that I've rejected previously.

MR. TERAN: Okay. Well, let me clarify this, Your Honor. We have checked with the Google terms and conditions for use. They specifically say this is not allowed. And so what I would like to propose is what I proposed back in December, right, is for the Court to issue an order to get these emails directly from the email providers.

THE COURT: No, I'm not going to do that. I

providers because the terms and conditions of those email accounts providers indicate that only they can access those email accounts.

THE COURT: I have -- I've made my order.

MR. TERAN: I understand.

THE COURT: I'm not persuaded by that. I've made my order --

MR. TERAN: Okay.

THE COURT: -- that it was clear then and, as I said, you had raised this for me before and in docket 167. I mean, that was a specific request for clarification. And I denied that and simply pointed to my order at 142 and that that was sufficient.

MR. TERAN: Okay. So let me just -- let me wrap up, Your Honor. Other than the emails, I think we complied with every other aspect of the Court's order. And to date, I have not seen --

THE COURT: But no emails have been turned over.

MR. TERAN: Right. Well, yes.

THE COURT: Like, no emails have been turned over and access to -- hold on one second. Just for purposes of clarification, there -- I listed in my order at docket 142 at page 2 by bullet points, there's 14 email addresses listed there.

MR. TERAN: Right.

THE COURT: On page 3, when I'm giving the time deadline, it refers back to the 12 email addresses. That should have been 14.

MR. TERAN: Right.

THE COURT: And so -- but in terms of what Spectrum's put at issue here, it's referring to the -- those are the 14 email addresses. And my point is no emails have been produced, like independently and unilaterally, and no access has been allowed to any of those --

MR. TERAN: Right.

THE COURT: -- has been obtained to any of those 14 email accounts.

MR. TERAN: And one thing to --

THE COURT: Correct?

MR. TERAN: That is correct, Your Honor.

THE COURT: I mean -- okay. All right.

MR. TERAN: But we don't have access to all those 14 email accounts. Because I believe, correct -- I've got to look into this, but I believe we only -- only two of those emails belong to URZ.

THE COURT: Uh-huh.

MR. TERAN: All these other emails belong to third parties.

THE COURT: Well, the -- you know, that goes back -- I'm not going to re-try the hearing that I had back -- I

think it was on December 13th --

MR. TERAN: Right.

THE COURT: -- that resulted in that list of 14 emails.

MR. TERAN: Right.

THE COURT: There was -- there is a factual basis for having listed them as factually as likely to contain relevant information for this litigation. That's why they were listed there.

MR. TERAN: Okay.

THE COURT: So -- and so I'm just saying that at the December hearing, if you made any argument about why I shouldn't be allowing access to those, that's fine. But I made my order as to these 14.

MR. TERAN: That's fine.

THE COURT: And so the ownership is something that was preserved -- resolved earlier.

MR. TERAN: All right. And then the other thing I would like to point out, Your Honor, the -- if you look at the allegations in this case, right, the merits do not support a likelihood of infringement here.

Because -- I think I pointed this out in a previous hearing -- this case relates to trademarks that are specifically intended to protect synthetic urine for purposes of urinalysis, right.

Mr. Teran?

And I would note, it looks -- I'm looking at the email accounts that are at issue at docket 142. There are three that are listed as something URZ or URZ Trendz, URZ Wholesale, and then one that is Ghafoor.usman23 who we've heard about Mr. Ghafoor in here. So some of these on their face are very URZ related, correct, Mr. Cupar, --

MR. CUPAR: That's right.

THE COURT: -- from your viewpoint?

MR. CUPAR: Exactly.

THE COURT: Okay.

Mr. Teran?

MR. TERAN: Just really quick, Your Honor. I am not saying that we do not know the custodians of these emails. We know the custodians of these emails.

THE COURT: Yeah.

MR. TERAN: Yeah.

THE COURT: That's what I thought.

MR. TERAN: Okay. Yeah. I -- counsel just indicated that to this point, we don't know the custodians of these emails. We do have that information.

THE COURT: What was the statement that you'd made previously that made him say something along the --

MR. TERAN: I don't know.

THE COURT: You had said something as you were

wrapping up about on the 14 accounts, you had said something about the identity of them, that you didn't know who they are.

MR. TERAN: Oh, no, no. I said that most of the email accounts do not belong to URZ.

THE COURT: To -- okay.

MR. TERAN: They're third-party email accounts.

THE COURT: But of -- but as I think we -- but from the hearing is was, like, but most of them are maybe -- well, some are URZ. At least there's URZ --

MR. TERAN: Right. Some are URZ.

THE COURT: -- branding on them. But on the others, they're employees that work at URZ, and they use that as part of their work email.

MR. TERAN: I believe that that's correct.

THE COURT: I thought that's what -- yeah.

MR. TERAN: I believe that's correct.

THE COURT: I thought that's what the record was.

MR. TERAN: Correct.

THE COURT: That's why they got on the list.

MR. TERAN: But they don't use these email accounts for purposes of URZ's business.

THE COURT: yeah.

MR. TERAN: Right? I think I made that clear before. They do not use -- these email accounts are not

email accounts that are being used in any way for URZ's business.

THE COURT: And that was the -- and as part of the order, there was going to be a screening process so that anything --

MR. TERAN: Right.

THE COURT: -- personal wasn't going to be turned over.

MR. TERAN: Right. No, that's right.

THE COURT: Yeah.

MR. TERAN: That's right.

THE COURT: Okay.

MR. TERAN: But again, Your Honor, I would like to --

THE COURT: But that the order was going to be -- that may well prove out to be true, but we were going to take a look at them to see what --

MR. TERAN: Right.

THE COURT: -- relevant was there.

MR. TERAN: That is correct.

THE COURT: Okay. All right.

MR. TERAN: Yeah. So I just wanted to clarify that, that we do know the custodians.

And Your Honor, once again, I would like to reiterate that with Your Honor's order to turn over the two-

out.  It is on the record right here.  We were ordered to do this.

THE COURT:  If the issue ever returns to me because you successfully appealed to the Fifth Circuit, I will take you at your word at that time, because then we'll be back to merits discovery.

MR. TERAN:  Right.

THE COURT:  But that's not where we are now.

MR. TERAN:  Okay.

THE COURT:  Thank you, sir.

All right.  I am going to grant the motion for termination sanctions.  I find, and I have previously found in many orders along the way that there have been violation of my discovery orders.

And I have attempted time and again to allow for compliance and late compliance of my orders in this regard. And so, the following orders pertain and I do believe have been violated.

It's dockets 63, 80, 97, 111, 118, 120, 142, and 151.  All of that was culminating in docket order 142, which is what we've been doing talking about in the main here today.

And then docket 151 was a clarifying order that we've also been talking about where I was giving a last chance to comply.

It's very clear that the emails, no emails have been provided and access to the listed email accounts in docket 142 was never given.

I find that there's sufficient evidence to say that the -- that there were two computers as identified in the motion for sanctions, but then also specified in the reply, the two computers that were allowed to become inoperable prior to inspection, that those weren't preserved, and that there's an external drive that communicated with the computers that hasn't been preserved.

And so then following on from there -- hold on. I just want to turn the pages on, make sure I'm looking at the right -- give me just a moment.

So I need to make findings that the discovery violation was willful and that a lesser sanction would not have substantially achieved the desired deterrent effect.

And I do find with there being seven discovery-related orders that haven't been complied with, that the violation was willful.

This is particularly true after the very lengthy and indulgent hearing that I had on the record in person in December after which I entered a very specific order for what compliance was going to be and upon which I had been given assurances that there would be complete -- that there would be compliance with that order, and that has not

happened. So I find that to be willful violation.

We don't know where the USB drive is, and there's been no good explanation for that, that I find.

There was a passage in time from the first ordered date of inspection in July of last year until when it was to happen in August. But how those computers became inoperable or why or the timing of that when it actually happened hasn't been substantiated by the Defendant. And the order has been to allow access and give access to those computers and that it hasn't happened.

I have clearly attempted several times to impose lesser sanctions to no effect, and I don't know what else to say on that point given the length of the hearings and the number of orders that I have issued.

I find that Spectrum's been prejudiced by the violations. This has cost a lot of money and time to this point. And ongoing conduct that's been the subject of complaint has been continuing of trademark violation, and unfair competition, and Lanhan Act has been ongoing all of this time, at least as alleged, and going forward in a way that has prevented the Court from getting to the bottom of what is the extent of the actual violation.

And the record does indicate that much evidence has not been turned over, and it's in a context of a missing flash drive and two inoperable computers. That does look

like -- and I do find destruction and spoliation of key evidence.

And so, I have a detailed order presented and requested for entry by Defendants at docket 160-1. I'm going to review it more closely. But that order, or something substantially along those lines, will be entered in due course relatively promptly.

I note that the request for the attorneys' fees and costs, as it stood as of the motion that was requested, Mr. Cupar, that request wasn't for all fees in this litigation; it was just for discovery issues, correct?

MR. CUPAR: That's correct.

THE COURT: And that totaled 300 -- almost $329,000 in fees and costs of nearly $50,000. So you'll be making a request for more than that, correct?

MR. CUPAR: That's correct, Your Honor.

THE COURT: Okay. And there's an injunction that is to be issued that's requested.

Mr. Cupar, any questions or clarifications for me? Anything else I would need to attend to from your standpoint?

MR. CUPAR: No, Your Honor.

THE COURT: Okay. Mr. Teran, anything? I mean, other than renewing your objections to my order, anything else that you need for clarification for your purposes?

MR. TERAN: No, Your Honor.

THE COURT: All right.

Sir, given the entry of this order -- I know you're going to talk with your client about it. It's obviously terminating sanctions. There's a substantial amount of money yet to be awarded. That was in terms of -- there'll be -- I don't even know what the request for damages is going to be. There's going to be that.

There's going to be the request for the attorneys' fees. There's a request for that as against URZ, as against Mr. Ghafoor personally, as against you personally. I don't have -- I don't relish doing any of that.

I would urge you to talk with your client now just about settling this case and resolving this case. Maybe there's a basis on which you can do it. Or, you know, because the other option is going to be obviously continue it on appeal. That's fine, you know, but more fees are going to incur. And if you're wrong, it's just going to get worse as it goes along.

MR. TERAN: Understood, Your Honor.

THE COURT: All right. Do you-all want to -- before I issue the order granting the motion for termination sanctions, Mr. Cupar, do you want to have the opportunity to talk with Mr. Teran and his client on some short basis to see if anything fruitful in that regard? I'm not even

asking you to do that.

Would you like to do that before I enter an order, or would you just -- because I would hope now that you know what I'm going to do, both sides know that this is going -- that this is the result, maybe there's a basis.

And I don't know if it -- whether before entry of this order or after makes more sense. But, like, what timeline, if any, would you like to talk with the other side about whether there's the potential for resolution now?

MR. CUPAR: I will talk with Mr. Teran and see if we can get something resolved. I don't think delaying the termination order, though, is necessary with that. But I can say that I will have that discussion and attempt to resolve this.

THE COURT: I'll say I will plan to enter the order, like, the ultimate order by the end of the day Friday. If you-all want to give me notice to hold off on that, a joint request to hold off on that because you-all are going to discuss whatever, I would hold off.

MR. CUPAR: Okay.

THE COURT: But we'll do it on that timeline.

MR. CUPAR: Thank you, Your Honor.

THE COURT: Okay.

MR. TERAN: And Your Honor, if I may, I would like to request the Court issue a stay pending appeal if we go

that far.

THE COURT: I will take that up in due course. I could see the potential for stay on some aspects, but like the injunction that I would be ordering, because we might get to an agreement as to, like, what would be stayed and what could be put off in terms of, like, monies to be paid and et cetera versus who's stopping what conduct now. There could be differences on that.

So I'll take a request for that at the appropriate time. But that's kind of like -- looking at the order that's been requested, some things in it, I could see the potential that that could make sense, but not all aspects of it given the context.

MR. TERAN: Fair enough, Your Honor.

THE COURT: Okay. All right.

MR. TERAN: Thank you.

THE COURT: Anything else?

MR. CUPAR: No, nothing from Plaintiff, Your Honor.

MR. TERAN: No, Your Honor.

THE COURT: All right. Thank you. We're adjourned.

(Proceedings adjourned at 4:53 p.m.)

*  *  *  *  *

I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.

/S/   MARY   D.   HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #69883

DATE FILED:  June 30, 2025